69 N.J. Super. 514 (1961)
174 A.2d 631
BOROUGH OF ENGLEWOOD CLIFFS, PETITIONER-RESPONDENT,
v.
THE ESTATE OF WILLIAM O. ALLISON, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1961.
Decided October 19, 1961.
*516 Before Judges GAULKIN, KILKENNY and HERBERT.
Mr. Walter D. Van Riper argued the cause for appellant.
Mr. Daniel Gilady argued the cause for respondent (Mr. Harry L. Towe, attorney).
The opinion of the court was delivered by HERBERT, J.S.C. (temporarily assigned).
Trustees under the will of William O. Allison have for many years owned a tract of land in Englewood Cliffs. This tract is known as Allison Park and contains a total of 7.808 acres. It is located on top of the Palisades and the visitor has a view to the east over the Hudson River and the City of New York. It has been carefully developed for park use with footpaths, benches, a parking area and appropriate landscaping, and is open to the public except during the winter months. No admission is charged.
For the year 1959 the Borough of Englewood Cliffs assessed Allison Park at a total of $52,065 for land and improvements. *517 This total was 25% of the estimated true value, that being the ratio or percentage in general use by the borough in 1959. The Allison trustees appealed to the county board of taxation which held the property exempt and set the assessment aside. When the borough appealed to the State Division of Tax Appeals the entire assessment of $52,065 was restored, and from that judgment the trustees have taken this appeal.
Mr. Allison's will is dated July 11, 1924. In it he describes himself as "of the Borough of Englewood Cliffs." Testamentary provisions pertinent for present purposes are these:
"I. It is my desire and intention to dispose by gift of a large part of my remaining estate for the purpose of pleasing Almighty God, benefitting my fellow man, and as far as possible developing that section of the Palisades along the Hudson, located in the Borough of Englewood Cliffs and vicinity.

* * * * * * * *
XI. All the rest, residue and remainder of my property, real and personal, whatsoever and wheresoever situate not hereinbefore specifically bequeathed, I give and devise and bequeath unto my said Trustees, in trust nevertheless, to maintain and develop in accordance with my known wishes, the Palisades along the Hudson, in the Borough of Englewood Cliffs and vicinity. I am now formulating more definitely, plans for the development and maintenance of said Palisades, and to that end have requested two prominent residents of the City of Englewood, to submit to me a plan for such development and maintenance. If such plan is submitted and receives my approval, then I direct my Trustees to use this Trust Fund for the purpose of carrying out such plan. If, however, such plan does not receive my approval, then I order and direct my said Trustees to use this Trust Fund for the development and maintenance of said Palisades Section in accordance with my wishes as expressed to them.
XII: I hereby authorize and empower my executors and Trustees to sell any and all real property standing in my name at the time of my death, and to execute such instruments as may be necessary to effectuate this power."
The effect of paragraphs I and XI  quoted above  of the Allison will were long ago considered and settled. Within two months after her father died on December 18, 1924 a *518 daughter of Mr. Allison started suit to have his will voided. The Attorney General of New Jersey was brought into the case and filed an answer claiming that the residuary gift to the trustees was for a charitable use and valid. The Court of Chancery decided in favor of the daughter, but on appeal by the Attorney General and the trustees judgment was reversed. Noice v. Schnell, 101 N.J. Eq. 252 (E. & A. 1927), certiorari denied sub nom. Allison v. Schnell, 276 U.S. 625, 48 S.Ct. 304, 72 L.Ed. 738. The Court of Errors and Appeals stated its conclusion (101 N.J. Eq. 272) in these words:
"We deem the disposition of his residuary estate made by Mr. Allison to be a valid charitable trust, sufficiently definite for enforcement and execution in accordance with the wishes of Mr. Allison as expressed generally in his will through the trustees appointed by him, who are vested with a discretion to devise the method and ways for the accomplishment of the testator's purpose."
It is not argued here, nor was it before the State Division of Tax Appeals, that Allison Park is exempt from taxation under our statutes. N.J.S.A. 54:4-2.1, 2.2, 3.3 and 3.6. The trustees contend that the property assessed has no substantial market value, being limited to use as a public park and therefore unsaleable. The State Division disposed of this contention by holding that, in the absence of statutory exemption, restrictions on use which may destroy or impair possibility of sale cannot be allowed to become what amounts to an owner-created exemption. The State Division said:
"To hold any other view would permit an owner without the authority of law to create a tax exempt situation which would supersede the exemptions allowed by law and add one more exemption which the Legislature did not allow."
The State Division correctly concluded that Allison Park is not exempted by statute from local real estate taxation. The legislation which gives exemption to publicly owned and used property was obviously drafted with no *519 thought of a public park owned by testamentary trustees. N.J.S.A. 54:4-3.3 through 3.5. And the statute which confers tax benefits upon non-profit organizations applies by its terms to buildings used for schools, churches, hospitals, and the like, and only exempts land as an incident of the exemption of the buildings upon it. N.J.S.A. 54:4-3.6. There is no provision in that section for parks, playgrounds and the like, where the land itself is of primary importance and any buildings are of minor importance. Allison Park is used by a great many people because of the land itself. The caretaker's house, tool sheds and comfort stations in the park are not buildings which would have any claim to exemption under the statute nor does their existence give the park acreage any claim to exemption.
In reversing the county board and restoring the total assessment of $52,065 the Division of Tax Appeals relied upon the testimony of the borough's expert, who considered and valued Allison Park as though it were an ordinary piece of commercial property available for sale free of restrictions at any time the trustees might make up their minds to sell. Was that the correct approach to the problem? If the terms of the Allison will make it impossible, or virtually impossible to sell the park at any price, should that condition have been determined and recognized when deciding, as called for by statute, upon "true value"?
If the trustees should decide to sell Allison Park, it is extremely doubtful that they could find a buyer for what they have to offer. They have a site with great appeal, but they do not have a title which would satisfy a prospective purchaser desiring a site for business or residential use. The history of sales made and attempted by the Allison trustees is described in reported cases: City of Englewood v. Allison Land Co., 25 N.J. Super. 466 (Ch. Div. 1953); City of Englewood v. Allison Land Co., 40 N.J. Super. 495 (Ch. Div. 1956); affirmed 45 N.J. Super. 538 (App. Div. 1957). These cases give considerable history and we draw heavily upon them for the facts stated in the next few paragraphs.
*520 Mr. Allison left, in round figures, an estate of $3,100,000. He owned all of the stock of Allison Land Company, and the value of this stock represented approximately $1,800,000 of his entire estate. The company owned 600 acres, more or less, of vacant land located in the northeast portion of Bergen County. In 1942 the trustees of the Allison will, who were also directors of the land company, obtained approval from the New Jersey Court of Chancery of a proposed gift of part of the Allison holdings to Palisades Interstate Park Commission. The Attorney General consented to the court's decree. Appropriate comment is made in 25 N.J. Super., at page 469 that
"Since the Commission was committed to the duty of protecting and developing the Palisades, an objective which had occasioned the creation of the Allison trust, the conveyance could justly be considered to be in furtherance of the desires of Mr. Allison."
In 1944 a similar application for approval of another gift to the Park Commission was made to the Court of Chancery. It was consented to by the Attorney General and approval was given by the court. Another transfer was consented to by the Attorney General and approved by the Chancery Division in 1953. This one was a sale of about 80 acres in Englewood Cliffs for purposes of private development.
In the 1944 proceeding, mentioned above, the order signed by the court contained these paragraphs (25 N.J. Super., at page 470):
"`1. That the function of the trust as imposed upon the petitioner as surviving trustee of the estate of William O. Allison is that the fund shall be applied in a manner that shall maintain and preserve the integral beauty of the Palisades in Englewood Cliffs, Fort Lee and vicinity.'

* * * * * * * *
`3. That the trustees or trustee by reason of the duties imposed upon them or him in the performance of the William O. Allison trust and in order to carry out and fully perform the duties of said trust are or is empowered and authorized to sell and dispose of any and all real property of the trust whether held in the name of Allison Land Company, of William O. Allison, of the estate of *521 William O. Allison or trustees or trustee and to make, execute and deliver all instruments that may be necessary to transfer and deliver a proper legal title to said lands or any of them.'"
In June 1952 substituted trustees contracted to sell to one Kriegel about 74 acres of land in the City of Englewood held in the name of the Allison Land Company. Kriegel intended to use the property as the site for a residential development. The City of Englewood and a citizen brought suit to enjoin the sale, contending that the land in question had been dedicated to public use as a park. The Attorney General was named as a defendant and he joined with the plaintiffs in asking the court to block the sale. The substituted trustees took the position that they were clothed with absolute discretion as to the manner of administering the trust and carrying out its objects; that they should not be subjected to interference by the court with the exercise of their discretion. Granting an interlocutory restraint, the court said in its opinion (25 N.J. Super., at page 471):
"There is no doubt that the trustees in their discretion are authorized to sell the real and personal property comprising the trust estate. But the right to exercise that discretion is not absolute. It is tempered by the intent of the testator. Foley v. Devine, 95 N.J. Eq. 473 (Ch. 1924). In this case the discretion of the trustees is limited by the requirement that it should be exercised only for the maintenance and development of the Palisades. Noice v. Schnell, supra.
Considering the action of the trustees in the light of the expressed intention of Mr. Allison, I am of the opinion that the sale should be restrained. I am unable to see how the maintenance and preservation of the Palisades would be advanced by the sale of a major portion of the trust property to a private developer."
After testimony had been taken on behalf of all parties the same case came before the Chancery Division again. The same result was reached; the injunction against the proposed sale was continued in force.
Concerning the situation which motivated Mr. Allison and the subsequent changes in it, the court commented (40 N.J. Super., at page 498):
*522 "At the time of Mr. Allison's death the escarpment of the Palisades was in danger of destruction as a result of quarrying operations. Today that danger has been removed, thanks largely to private benefaction which made possible the construction of the Palisade Interstate Park. Title to the property bordering the face of the cliffs is now held either by the Palisade Interstate Park Commission or the New Jersey State Highway Department. The only exception is one tract which is operated as a park by the trustees of the Allison estate."
The final sentence of this quotation obviously refers to the park property covered by the tax assessment which is the subject of this appeal. No part of that was involved in the proposed sale by the trustees to Kriegel. The tract he sought for development purposes was on the western slope of the Palisades and was in a natural state. For years the trustees had been considering the construction of a park on that land but had concluded that the very large expenditures required for the type of park they had in mind would not be justified. Thereupon they contracted to sell to Kriegel.
Even though the tract in question was in its natural state, the City of Englewood opposed the sale on the ground that the property was dedicated for park purposes. After pointing out that no willingness by the city to maintain the park had ever been indicated, the court concluded that the plans for a park which had been described by the trustees in their applications of 1942 and 1944 "* * * were mere expressions of the trustees' thoughts with regard to the future development of the property," and that the claim of dedication had not been established (40 N.J. Super., at page 499). The reasons for a permanent injunction against the proposed sale were summed up as follows (40 N.J. Super., at page 500):
"I am satisfied from the testimony that the tract under consideration is especially well adapted for use as a natural park as distinguished from one more formal in character. As against the estimate of costs, introduced by the trustees, there is very respectable testimony that for an expenditure of less than $3,000 trails could be constructed which would render the tract completely accessible to *523 the public. In fact, the point is stressed that construction and improvements should be kept at a minimum if the tract is to retain its greatest value.
As I have said before, I am firmly of the opinion that the maintaining of this tract of land in its natural state, thus protecting the plant, animal and bird life of the Palisades, is a project completely in harmony with the intent of the testator.
It is not my purpose to tell the trustees what they should do. Rather, my function is to exercise a veto of actions which I feel do not carry forward the purposes of the trust. Accordingly, on the basis of the evidence before me, I shall continue the injunction against the consummation of the sale presently under consideration. The right of the trustees to make a further application for permission to dispose of the property, if changed conditions make such a course of action desirable, is reserved."
On appeal the injunction against the proposed sale was affirmed and the reasoning of the Chancery Division was expressly adopted. 45 N.J. Super. 538, 541.
From the reported cases which have been mentioned and from the record in the case before us, it appears that Allison Park was one of the earliest, if not the earliest, effort of the trustees to carry out Mr. Allison's intentions and make the terms of the trust effective. It also appears that this park is more obviously located in the area which the testator meant to preserve than the acreage on the western slope of the Palisades which the trustees were enjoined from selling to Kriegel for private development.
It is difficult to imagine a situation in which the Attorney General would not oppose on behalf of the public a proposed sale of Allison Park. The number of park visitors is estimated at between 75,000 and 100,000 a year. It may also be doubted that the members of the governing body of the Borough of Englewood Cliffs would find it practically possible to urge the Chancery Division to approve such a sale. Finally, the terms of Mr. Allison's will and the legal history of the trust make it most doubtful that any sale of park land for ordinary business or residential use would ever be approved by the courts, no matter how large a price might be offered by the prospective buyer.
*524 In passing, we may note an instance recently mentioned in Graham v. Edison Township, 35 N.J. 537, 550 (1961). The Trustees of Free Schools of the Town of Woodbridge made a contract in 1955 to sell for a large sum to a manufacturing company lands which had been set aside "for the maintenance of a free schoole" by the colonial proprietors in 1669. The prospective purchaser was unable to get title insurance and the contract was voided. We think there is little, if any, question that the Allison trustees would have a similar experience if they should seek a buyer.
The expert witness called by the borough admitted that if the park property is dedicated to public use and can only be used for public purposes without any profit accruing to the owner, then it would have no market value. This is an obvious conclusion from the facts assumed in the question he was answering, but we think it would be unrealistic to reach any other conclusion. The likelihood of selling the park is so slight as to be almost non-existent. The title of the trustees can have only such market value as would reflect its nominal saleability.
Nor have we overlooked remote possibilities of sale. It is conceivable that a public body having powers of eminent domain might acquire the park or some substantial part of it, in which event no court approval of sale would be needed, or almost certainly would be granted; and if the trustees were willing to ignore the checks upon their freedom of action which were asserted by the Chancery Division when they attempted to make the sale to Kriegel in 1952, it is perhaps conceivable that they might find a speculator willing to pay a small price for such a finely located piece of property with the idea of taking a chance on the legal power of the trustees to give him good title and with the hope of being able to finance and carry out some scheme for profitable development. These remote contingencies do not alter our conclusion that the property assessed, because of the restrictions upon its use, has only a small fraction of the money value it would have if unrestricted.
*525 If the trustees have no real market value to offer for sale, does that necessarily lead to a nominal tax assessment? An assessor must determine "true value" of the property assessed. L. 1947, c. 413, § 14, p. 1287, N.J.S.A. 54:4-1; L. 1960, c. 51, N.J.S.A. 54:4-2.25. True value means market value as of the assessment date. Town of Kearny v. Division of Tax Appeals, 137 N.J.L. 634 (Sup. Ct. 1948), affirmed 1 N.J. 409 (1949). Yet market value to the owner of an encumbered title is not always a basis for assessing real estate. Bonbright, "The Valuation of Real Estate for Tax Purposes," 34 Colum. L. Rev. 1397, 1435, says:
"Real estate is commonly split up into separate legal interests held by different persons  mortgagor and mortgagee, landlord, tenant, and subtenant, holders of various easements over the land, and so forth. Here, too, one would think, an allocation problem is presented; for if these legal interests are regarded as so many separate properties, must not the unitary value of the physically undivided land be apportioned among them? Contrary to expectation, the answer is that the general property tax ordinarily pays no attention to these divisions of interest and assesses the property as if it were owned in fee simple. Yet even the property tax stops short of totally disregarding the partial legal interests.
John Doe is the owner of a house and lot. He conveys an easement to his neighbor, Richard Roe. He mortgages the property to a local bank. He executes a ten-year lease to John Doe, Jr. at the rental of one dollar a year. Then assessment time arrives, and he finds himself assessed on the full value of the land. He prepares a petition in abatement, setting forth that the three acts have greatly lessened the value of his property. His petition will be denied as to the lease and the mortgage, but may be granted as to the easement. It is well settled at common law and rarely changed by statute, that the mortgagor and the lessor pay the entire tax on the property as if there were no mortgage or lease, and that the life tenant pays the entire tax just as if there were no remainderman. But it has also been held that a landowner whose property is subject to an easement is entitled to a reduced valuation, the value of the easement being added to the estate of the dominant owner. When a piece of property is so encumbered with easements that no use can be made of it, the fee owner pays no tax. What is true of easements is true also of covenants binding the land.

* * * * * * * *
The proper deduction from the value of the servient estate and the proper addition to the value of the dominant estate are determined *526 largely by the opinion of real estate experts, aided by occasional selling prices, since easements are sometimes the subject of separate sale. One should note that there is no necessary equivalence between the damage a landowner suffers by being subjected to an easement and the benefit other land obtains from that easement. An easement of passage over A's forest land to the road may greatly enhance the value of B's hotel property without correspondingly depreciating A's land; while on the other hand an easement of light over C's lot may merely make D's backyard somewhat pleasanter while preventing C from building an apartment house."
Our courts have recognized that a piece of property which is burdened by an easement for the benefit of an adjoining piece of property should not be assessed as though that easement had no existence. The burden of the easement is an element of value to be subtracted when making the assessment. Ehren Realty Co. v. Magna Charta B. & L. Assn., 120 N.J. Eq. 136 (Ch. 1936); Metropolitan Life Insurance Company v. Mc Gurk, 119 N.J.L. 517 (E. & A. 1938); Niestat v. Equitable Security Co., 138 N.J. Eq. 480 (Ch. 1946); Lipman v. Shriver, 51 N.J. Super. 356, 359 et seq. (Law Div. 1958). Other states also have held that a tax assessor should deduct for an easement when assessing the servient tenement. Tax Lien Co. of N.Y. v. Schultze, 213 N.Y. 9, 106 N.E. 751, L.R.A. 1915D, 1115 (Ct. App. 1914) Tide-Water Pipe Co., Ltd. v. Bell, 280 Pa. 104, 124 A. 351 (Sup. Ct. 1924); Gowen v. Swain, 90 N.H. 383, 10 A.2d 249 (Sup. Ct. 1939). There should be a similar deduction when assessing land which has been burdened by a restrictive covenant for the benefit of neighboring properties. Lodge v. Swampscott, 216 Mass. 260, 103 N.E. 635 (Sup. Jud. Ct. 1913).
People ex rel. Poor v. O'Donnel, 139 App. Div. 83, 124 N.Y.S. 36 (App. Div. 1910), affirmed 200 N.Y. 518, 93 N.E. 1129 (Ct. App. 1910), involved large assessments by the City of New York on Gramercy Park. In 1831 Samuel Ruggles conveyed the land in question to trustees to hold, develop and maintain as a park for the benefit of the owners and occupants of 66 specified lots surrounding *527 or in the immediate vicinity of the land conveyed. Ruggles gave legal reinforcement to his scheme by a subsequent deed providing that the right to use the park would be an easement appurtenant to any of the 66 lots which had theretofore been conveyed and to those subsequently sold off. Long after Gramercy Park came into actual existence the city assessed the land within its boundaries at $500,000 for each of the years 1903 and 1904, and raised the assessment to $750,000 for the year 1905. When the defendant tax commissioners moved to quash the writ of certiorari which had been obtained to challenge the assessments by the trustees of the park property, Justice Dowling, whose opinion was adopted by the Appellate Division and affirmed on appeal, denied the motion. In that opinion it was said (124 N.Y.S. at page 38):
"By section 889 of the Greater New York Charter (Laws 1901, c. 466), it is made the duty of the deputy tax commissioners in arriving at their conclusions as to the assessable value of taxable property, to state, under oath, to the board, the sum for which, in their judgment, each separately assessed parcel of real estate, under ordinary circumstances, would sell if they were wholly unimproved. Under this provision, it is the duty of commissioners of taxes and assessments to assess this property year by year at its actual market value, no more, no less. People ex rel. M.R. Co. v. Barker, 146 N.Y. 304, 312, 40 N.E. 996. In this case it is apparent, from the statement heretofore made, that the relators property cannot be sold, under ordinary circumstances, for any sum whatever. No person buying this property would acquire any beneficial interest therein. Assuming that he could get legal title to it from the trustees, subject to the easements, his title would simply be a naked one with none of the usual advantages attendant upon the ownership of real estate; he would simply hold a title to a piece of property from which he could derive no benefit and in which he could have no rights of enjoyment, but which would be devoted entirely to the enjoyment and use of the surrounding property owners."
The opinion goes on to point out that the city had in fact included in the assessments of property surrounding the park an element of value for the right of the tenants to enjoy the park.
*528 In People ex rel. Topping v. Purdy, 143 App. Div. 389, 128 N.Y.S. 569 (App. Div. 1911), affirmed 202 N.Y. 550, 95 N.E. 1137 (Ct. App. 1911), the idea that a dominant easement must be assessed if the servient tenement is to avoid assessment was rejected. There a paper street had been eliminated by a change in the city map. Before the change, however, the owner of the bed of the street had conveyed to others adjacent lands and had included rights of air and access over the street bed. An assessment of $2,500 upon the land which had formerly been in the bed of the street was set aside, the court saying (128 N.Y.S. at pages 572 et seq.):
"The element of double taxation does not appear in the matter at bar. It is not shown that the property on both sides of this discontinued private road which does not appear ever to have been laid out except upon paper has had added to it the value of the easements therein. But the fact is that a piece of real estate which had been deprived of all its valuable attributes, so far as the owner was concerned, was treated by the tax commissioners as if still possessing them. Under the Constitution (article 1, § 6) private property shall not be taken for public use without just compensation. If the city should undertake to acquire the relator's property by condemnation for any public use, it would not be required to pay therefor more than a nominal sum. All that would be taken from the owner would be the naked fee.

* * * * * * * *
If, then, the parcel of real estate has no real value for which compensation must be paid, if taken in condemnation proceedings, how can it have a value for purposes of taxation? Its valuable qualities have been attached to the adjoining properties which, by the acquisition of easements appurtenant thereto, have been increased in value and should be assessed accordingly. I do not see how the servient estate can be taxed upon the basis of the easements which have been made appurtenant to the dominant estate."
Allison Park is not subject to the rights of the owner of a dominant tenement. But it is subject to rights of use which are in the public at large. This is true in spite of the borough's argument that there has been no formal dedication and acceptance. Those steps are only one method *529 of creating public rights. There is no more question about the existence of public rights in the land the borough has assessed than there would be if a written dedication by the trustees had been recorded and a resolution of acceptance had been adopted.
By way of comparison a common situation in New Jersey may be noted. Many an owner holds title in fee to the center of the street on which his property fronts. His ownership is subject to the public rights in the street. It is obvious that the strip of land owned in fee which lies in the street bed should not be valued for assessment purposes as though saleable without encumbrances. The public rights, which absorb any real market value the strip would otherwise have, must be subtracted in the assessment process. See Bergen Turnpike Co. v. North Bergen Township, 95 N.J.L. 369 (Sup. Ct. 1920), in which an assessment for local real estate taxes on land in the bed of a former toll road was cancelled for the reason that the owner of the fee had no property of value to be assessed, the road having been used for over 25 years as an ordinary public road and so treated by the municipal authorities. Also see Tietjen Realty Co. v. Teaneck, 56 N.J.L.J. 125 (St. Bd. Tx. App. 1933), another case where outstanding public rights deprived the fee of all assessable value.
We conclude that it is immaterial for assessment purposes whether the fee owner holds a title subject to a private easement for the benefit of a dominant tenement, a public easement in a dedicated and accepted street, or public rights to use and enjoy a park under a charitable trust. In each case the land has been deprived of an element of value to be subtracted from the value of the fee. Possibility of adding that element in whole or part to other property, as in the case of a dominant tenement, is not the controlling factor. The assessor's duty is to determine true value of the property being assessed; he should not include elements of value transferred to other properties or transferred to the community at large in the form of public rights. *530 The record here, it may be added, is barren of information about the influence, if any, of proximity to the park upon the assessed values of neighboring properties.
The State Division of Tax Appeals erred when it ignored the outstanding rights of the public at large in Allison Park and restored the assessment of $52,065 on the park property. We may proceed to determine what the assessment should have been. R.S. 54:4-59. This becomes a matter of evaluating in money the remote possibilities of sale which have already been discussed, or, to state the problem another way, becomes a matter of evaluating the outstanding public rights which deprive the trustees' title of saleability. We are satisfied that sending the matter back to the State Division for further consideration of the assessment would be unlikely, because of the peculiar facts of the case, to lead to anything more helpful than the record we now have before us.
The assessment of $52,065, at the 25% ratio in use by the borough for 1959, represents a market value of $208,260. These figures result from an erroneous assumption of complete legal power in the trustees to sell the property free of trust restrictions and public rights. As to the earlier tax history of the property, the brief for the trustees states that taxes were paid for many years on a nominal assessment of $500 and were also paid on an assessment which was raised to over $20,000 for the year 1958. The borough takes no issue with these statements. Our evaluation of the possibilities of sale convinces us that an assessment of $20,000  which represents $80,000 at a 25% ratio  is too high. On the other hand, an assessment of $500 reflects, at the same ratio a market value of about $2,000, or only 1% of the total unencumbered value estimated by the borough's expert witness. Even though it is most unlikely Allison Park can ever be sold free of all public rights, fully available for residential or commercial use and at a full price, and most unlikely it can ever be sold at a low price or any price to a buyer willing to take title subject to legal restrictions and public rights, it is our judgment that an assessment of *531 $5,000 would be appropriate. In Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 163 (1949), the court noted the impossibility of measuring with mathematical precision the value of the property of a private water company and commented that the market affords no test for such properties, as they are rarely the subject of sale. The difficulties of evaluation in the case before us are even more obvious. But with a property which would be valued at $200,000 if free of public rights, it is, we think, sound to conclude that the public rights represent nine-tenths of the total value, or $180,000. Subtracting that sum leaves a residue of value  $20,000  for the fee ownership of the trustees, which produces an assessment of $5,000 at a 25% ratio.
The judgment of the Division of Tax Appeals is modified by reducing to a total of $5,000 the assessment on the property which is the subject of this appeal, being $4,500 on land and $500 on improvements.