A–S DEVELOPMENT, INC., a New Jersey corporation, Plaintiff,

v.

W. R. GRACE LAND CORPORATION, a New York corporation, Defendant.

Civ. No. 75–695.

United States District Court, D. New Jersey.

March 30, 1982.

Eugene M. Haring, Richard Eittreim, Ronald J. Hedges, McCarter & English, Newark, N. J., for plaintiff.

Allan H. Klinger, Klinger, Honig, Redish & Klinger, Hackensack, N. J., for defendant.

## OPINION

ANNE E. THOMPSON, District Judge.

### INTRODUCTION

This action began as a suit for specific performance of a real estate transfer. With the passage of time it became a claim for damages. On November 25, 1980, after a 12-day trial devoted exclusively to liability issues, this court rendered an opinion in favor of the plaintiff, A–S Development, Inc. The opinion held that the defendant W. R. Grace Land Corporation was liable for refusing to take title to Channel Club Tower, a Monmouth Beach condominium project, on March 13, 1975. Thereafter, on various days in September and November 1981, a damages trial was held. Subsequently, the parties submitted proposed Findings of Fact and Conclusions of Law. The parties submitted alternative damage schedules. I have carefully considered the thorough submissions of counsel and have drawn heavily upon them. The following Findings of Fact and Conclusions of Law are entered pursuant to Rule 52(a) of the *Federal Rules of Civil Procedure* as to the damages issues.

### FINDINGS OF FACT

In 1974 A–S Development, Inc. [hereinafter "A–S"], decided to terminate its real estate activities and to sell to the defendant W. R. Grace Land Corporation [hereinafter "Grace"], all of its substantial real estate holdings located in various parts of the United States. The parties drafted an agreement reciting the terms of that transfer dated June 30, 1974. Without the fault of the parties, one of the parcels in the transaction, Channel Club Tower, [hereinafter "CCT"], which was then under construction, became involved in a controversy regarding its electrical power supply. The parties agreed to remove the sale of CCT from the main agreement and to make it instead the subject of what was labeled a "supplemental agreement", also dated June 30, 1974. This supplemental agreement contained the specific conditions and contingencies relating to the transfer of CCT as well as to the transfer of A–S's interest in some undeveloped land not involved in this lawsuit.

*The Sales Price*

The supplemental agreement provided that the sales price for CCT was to be

the book value of CCT as of the close of business on the day prior to closing. This book value ultimately was to be "determined as specified in a letter of instructions addressed . . . to Arthur Young & Co.,"[1] an accounting firm. Book value was defined in the trial testimony as historical cost. By letter of March 12, 1975, A–S advised Grace that the book value was $9,632,364 subject to review and certification by Arthur Young & Co. Plaintiff obtained a review and certification of that figure in a report dated January 23, 1980. That report set forth a sales price of $9,721,754. The price included the following items and amounts:

| | |
|---|---|
| Land | $ 587,304 |
| Onsite Cost | 7,071,275 |
| General Conditions | 562,493 |
| Marketing Costs | 598,338 |
| Capitalized Interest | 543,323 |
| Commitment Fees and Other Finance Costs | 288,913 |
| Lag Time Costs | 70,108 |
| TOTAL | $9,721,754 |

Defendant does not contest these figures except for the item of capitalized interest. Defendant claims this $543,323 is unwarranted and improperly included as a component of sales price.

Plaintiff's justification for the inclusion of capitalized interest is as follows: A–S treated interest on its development projects as part of the historical cost or book value of the project. Interest, therefore, was capitalized as part of the cost of the project just as were costs for construction material and labor. CCT was part of the Twin Rivers Division of A–S operations. All of the other assets of the Twin Rivers Division were sold to Grace by A–S in the summer of 1974 pursuant to the above-mentioned main agreement. In accordance with A–S's policy of capitalizing interest, all of the interest on loans incurred for the Twin Rivers Division was capitalized and allocated to one of the projects of the Twin Rivers Division. For the year ended December 31, 1973, none of the capitalized interest was allocated to CCT although all of the interest expense incurred was allocated to one of the projects of the Twin Rivers Division.

For the first six months of 1974, until June 30, 1974, A–S continued its policy of allocating all interest in the Twin Rivers Division to various projects under construction. During this period, interest was allocated to CCT on a monthly basis. Once the sale of all other assets to Grace was completed in the summer of 1974, the proceeds of that sale were used to pay off all of A–S's lines of credit except for the line at the Wells Fargo Bank in California. Following June 30, 1974 and through the intended closing date of March 13, 1975, the interest expense incurred on the Wells Fargo line of credit was allocated to CCT, the only remaining real estate asset of A–S. In making this allocation A–S allocated 62% of the interest expense to CCT based upon the proportion of borrowings to the book value of all of the real estate projects of the Twin Rivers Division for the first six months of 1974.

Evidently, the defendant did not raise any objection to the inclusion of capitalized interest in the book value and the contract price for the other assets it purchased from A–S in the summer of 1974. The testimony of an accountant from Arthur Young & Co. was that the inclusion of capitalized interest in the book value of CCT was in accordance with generally accepted accounting principles.

1. The contract provided in relevant part,

B. The purchase price shall be the book value of Channel Club Tower as of the close of business on the day prior to the Club closing . . . The said book value shall be determined as specified in a letter of instructions addressed by Buyer and Seller to Arthur Young & Co., a copy of which is annexed hereto. Pending the determination by Arthur Young & Co., Buyer will pay to Seller at the Closing, by certified or bank cashier's check drawn on a New York bank, on account of the purchase price an amount equal to Seller's book value of Channel Club Tower as shown on Seller's books as of the close of business on the day prior to the Club Closing. Within fifteen days following notice of Arthur Young & Co.'s determination, the parties shall settle any overpayment or underpayment on account of the purchase price, as the case may be.

Defendant presented no expert to contest plaintiff's contentions. Rather, Grace argued that the inclusion of capitalized interest in the book value of CCT was inconsistent with prior CCT accounting practice, and was not shown to be directly related to a loan which provided funds to build CCT.

I find that the inclusion of capitalized interest was a proper procedure for calculating the cost of CCT and was a consequence of the agreement of the parties. The procedure took into consideration the fact that A–S and Grace had entered into a package deal, initially intended by the parties to be completed in a single undivided purchase. This arrangement regarding capitalization of interest took no unfair advantage of defendant who purchased all of the other assets in this package.

### The Damages

When defendant refused to close title on CCT on March 13, 1975, plaintiff proceeded to sell the individual apartment units to "retail" buyers. The market was sluggish, such units were not in demand and it took almost five years to sell out the building. The cash receipts A–S received from sales amounted to a total of $13,806,695 by June 1980. Defendant contends that this figure or the 1975 real estate tax assessment figure of $11,192,000 are indisputable evidence of the property's market value and should be used as a yardstick for the measure of damages. By comparing either figure to the contract price, defendant concludes that A–S suffered no damages. Defendant, however, disregards the fact that it took A–S almost five years to sell out CCT, that plaintiff suffered the loss of the use of the nine million dollar sales price for nearly five years and that this lost time had money value.

Expert testimony was presented on behalf of the plaintiff by Edwin F. Thompson, an expert in real estate valuation and investment. He presented several alternative methodologies by which the damages in this case may be determined. Each methodology involved three factors: 1) the contract price of $9,721,754; 2) the monthly receipts

for the sale of the units, less the cash disbursements for completion and marketing of the project from March 13, 1975 to the present;[2] and 3) the time value of money.

The monthly receipts were, in essence, plaintiff's attempt at mitigation of damages. By comparing the monthly cash receipts and cash disbursements, a net monthly cash flow was calculated. If receipts exceeded disbursements in a given month, the cash flow for that month was considered positive. If disbursements exceeded receipts in a given month, the cash flow for that month was considered negative. Defendant does not dispute the figures showing the cash flow for the project. Plaintiff has offered its three methodologies to reflect the damages it claims to have suffered because the amounts it received for the units in CCT were provided in piecemeal fashion over a period of five years rather than in one lump sum on March 13, 1975.

### Methodology No. 1

#### The Involuntary Loan Theory

The first theory construes defendant's failure to take title to CCT and to pay the purchase price on March 13, 1975 as an involuntary loan to Grace of $9,721,754, the book value purchase price. The theory contends Grace benefited by having the use of the money and by not having to pay the cost of a loan of that amount whereas A–S suffered by not receiving the full purchase price on that date. The monthly net receipts which A–S received from the sales of condominiums were viewed as payments on the "loan."

Plaintiff calculated damages on the involuntary loan theory using an interest rate of four percentage points above the prime rate set by the Chase Manhattan Bank for commercial borrowers given the best credit rating. Documents and testimony in evidence showed that Grace had taken steps to apply for a commercial loan of $9,500,000 at this interest rate to finance its purchase. Furthermore, plaintiff's expert, Mr. Thompson, testified that 4% above Chase Manhattan's

2. Plaintiff incurred construction and marketing costs after March 13, 1975 of $4,088,220.

prime would represent a contemporary market rate of interest, assuming that a willing lender could be found.

Plaintiff's involuntary loan theory apportions the monthly net receipts from CCT as monthly payments on interest and principal to repay a loan at the above rate on the full purchase price of $9,721,754.[3] Plaintiff introduced an amortization table (Plaintiff's Exhibit 137) showing the growth and reduction of the debt on a monthly basis from March 1975 to December 1981. Under this methodology, the balance due to A–S representing the purchase price plus accumulated interest is $5,846,518 as of December 31, 1981.

*Methodology No. 2*

*Alternative Capital Receipts*

Another methodology presented by plaintiff's expert was intended to determine the amount of money A–S and its parent American Standard, Inc. might have earned had A–S had the benefit of the sales price of $9,721,754 on March 13, 1975. The theory utilizes the rate of return on capital earned by American Standard, Inc. on its operations from March 1975 to the present, and hypothesizes the investment of funds from March 1975 to December 1981. The measure of damages is the difference between the amount of money to which the contract price would have grown, compared with the amount of money to which the net cash receipts grew. Damages under this method were $7,598,412 as of the end of December 1981. This represented the amount of money A–S was deprived of over the relevant time frame.

*Methodology No. 3*

*Alternative Sales Price*

The third methodology advanced by plaintiff's expert relies upon the principle of present value. Money to be received in the future is worth less than money re-

ceived today simply because in order to hand over a set amount in a year's time, only something less than that amount need be invested today so that it will appreciate in value to the amount due. Starting from March 13, 1975, the future net cash flow receipts were discounted by using an interest rate to convert them to a single price as of March 13, 1975, thereby purportedly showing the difference between the price A–S received and the contract price to which it was entitled (an alternative sales price). The difference was $2,646,823 and represents an estimate of damages as of that date. Since those damages were not paid as of that date, the damages of March 1975 were brought forward to the present time. The damages figure so obtained as of December 31, 1981 was $7,807,240. Under this methodology plaintiff's expert used an interest rate of 16%.

Mr. Thompson testified that there were no comparable sales of condominiums during this period of time from which to extract a market rate of interest. Therefore, he derived the 16% rate from a review of the yields to maturity on bonds of thirteen leading companies engaged in the business of real estate development at that time and whose bonds were traded publicly. The average yield on such bonds to maturity as of March 1975 was approximately 14%. To this 14% was added a two point increment to reflect the greater risk, the relative lack of liquidity and the added burden of management which plaintiff contends this condominium investment entailed. Thus the expert arrived at a 16% interest rate, an approximation of the rate of interest that real estate developers would supposedly demand for the use of their money.

One additional methodology was reviewed by plaintiff. Reference was made to a conventional market valuation (comparison of sales price with market price)

---

**3.** The monthly net cash flow was applied to the interest and then to the principal to reduce the amount of the loan. Under the involuntary loan theory, to the extent the positive cash flow exceeded the amount of the interest payment each month, it reduced the amount of the loan. To the extent that the cash flow was less than the interest, the balance of the loan was increased. Anytime there was no payment, the interest continued to accrue and was added to the outstanding balance on the loan, or was added to the principal balance on the loan and, therefore, the loan would increase on that basis.

performed by Landauer Associates, the real estate consulting firm with which plaintiff's expert, Edwin Thompson, was associated. That valuation resulted in a market value for CCT as of March 1975 of $5,500,000. Applying an interest rate of 16% compounded monthly from March of 1975 to the present time would, under this theory, result in damages to A–S of approximately $10,000,000 as of September 1981.

Using the above methodologies, plaintiff supplied the court with the damage figures derived from various permutations of these formulae. Some were based on variations of simple interest, others were based on compounded interest. It was plaintiff's position that the use of compound interest rates is the more appropriate method, reflecting the actual practices of real estate investing. Furthermore, plaintiff contended that compounded interest is the most effective means of placing the parties in the positions each would be in if the contract had been performed. In conclusion, plaintiff projected a figure of $6,000,000 as the amount necessary to make A–S whole as of the end of September 1981. In reaching this figure plaintiff's expert placed greatest reliance on Methodology No. 1, secondary reliance on Methodology No. 3 and the least reliance on Methodology No. 2. It was his view that Methodology No. 1 involved the least judgmental factors and was the most objective measure of plaintiff's damages. He regarded theory No. 2 as confirming his other two methods but he accorded it less weight than the other two methodologies.

Grace rejects A–S's methodologies as illogical theories having no precedent in statutory or decisional law and as fanciful attempts to create damages where none were present. However, defendant presented no expert witness to critique plaintiff's methodologies or to counter plaintiff's supposedly exotic theories.

Grace's initial thesis—that plaintiff suffered no damage or minimal damage by virtue of Grace's failure to buy CCT—is unsupportable in the context of practical investments. To completely ignore the passage of time during plaintiff's efforts at mitigation of damages is to overlook a most obvious aspect of plaintiff's injury. That plaintiff sought to sell this property to Grace as a departure from the real estate business and not as a profit-making transaction in and of itself is not dispositive of plaintiff's lost profits claim. There is no question but that had A–S received the purchase price when it was due on March 13, 1975, it would have been in a position to invest the money in a potentially profitable undertaking. The time value of money due is a valid consideration to be used in measuring plaintiff's damages in this case.

Turning now to the three theories of damages advanced by plaintiff, the court will note their weaknesses and shortcomings and the arguments most heavily targeted by defendant. The involuntary loan theory, advanced as the least judgmental methodology, relies on certain assumptions which may or may not be completely valid. First, it is bottomed on an assumption that Grace was to borrow the funds to purchase CCT from a commercial lender at a rate of four percentage points over prime. Then it harnesses Grace to loan "repayments" paralleling the monthly net cash receipts plaintiff received during the nearly five years it took to sell out the project. No allowance is made for early repayment, which the Grace documents indicate was an expectation of Grace's loan application plan. The involuntary loan theory appears harsh inasmuch as the damages continued to grow even after the project was completely sold out. The theory places plaintiff in the highly favorable position of being a commercial mortgagee with a fail-safe mortgage despite the fact that A–S might have taken the nine million dollar sale price it received from Grace on March 13, 1975 and deposited it in a less favorable investment.

The alternative capital receipts theory designated by plaintiff as Methodology No. 2 is vulnerable in that it does not necessarily reflect real estate rates of interest. Defendant attacks the fact that this theory is based upon the rate of return on investment earned by the parent company, American Standard, Inc., rather than the return

rate of the plaintiff, A–S Development, Inc. Further, Grace argues that no evidence was introduced showing that plaintiff or American Standard, Inc. contemplated any particular investment that would have earned the rates of return encompassed by this theory. Without commenting on these objections, I note that plaintiff offers this theory mainly as a corroboration of the reliability of the other two theories and, therefore, I, also, will accord it less consideration.

The alternative sales price theory was interesting but less satisfying than the involuntary loan theory. It relies upon yields to maturity of bonds not related to the subject matter of this lawsuit. The 16% interest rate employed in its calculations was the result of a professional judgment which was related in only a general way to the particular investment in this case. The theory has appeal because it targets the problem of the damage suffered by the loss of the time value of money but it is developed in a fashion which lends it less acceptability.

It is the court's duty to fashion an award of damages based upon a reasonable design for remedying the loss and putting the plaintiff in the position it would have been in had defendant not breached its contract. The court is persuaded that the methodology of the involuntary loan is, in the final analysis, the fairest design for compensating plaintiff for its loss. The court will mold a recovery based on this scheme.

*Counsel Fees*

Both the main agreement and the supplemental agreement signed by the parties to this lawsuit were dated June 30, 1974. The body of the supplemental agreement began with this preamble: "[w]hereas, the parties desire to supplement the [main] agreement . . ." One of the provisions of the main agreement concerned attorneys' fees. It stated:

> 20.4 In the event that Seller shall at any time or from time to time suffer any damage, liability or loss (including, but not limited to, reasonable attorneys' fees reasonably incurred and other costs and expenses incident to any suit, action, proceedings, or the defense of any claim), arising out of or resulting from (a) any inaccuracy in any representation or the breach of any warranty of Buyer, (b) any failure of Buyer duly to perform or observe any term, provision, covenant, agreement or condition hereunder on its part to be performed or observed, or (c) the imposition upon Seller or assessment against Seller of any obligation or liability assumed by Buyer pursuant to this Agreement or described in any schedule hereto or arising from the operations and business of Buyer on and after the Closing Date, which results in loss, damage or liability to Seller or a payment by Seller, Buyer shall indemnify and save and hold Seller harmless from and against any such resulting damage, liability or loss, and pay to Buyer on demand the full amount of any such sum.

Plaintiff contends that the transfer of CCT, the subject matter of the supplemental agreement, must be construed in conjunction with the attorneys' fees clause in the main agreement. It has submitted an affidavit of services and a supplemental affidavit of services detailing those disbursements and fees incurred and paid by plaintiff during the seven years of this litigation.

The critical question is: Does the attorneys' fees provision in the main agreement support plaintiff's claim for fees when the transfer of CCT was removed from the main agreement and made the subject of a separate supplemental agreement? Put another way, did the parties intend the terms of the main agreement to apply to the supplemental agreement?

No witness testified on this issue. The court is left to discover the intent of the parties from the language used in the instruments and the conduct of the parties. A dictionary definition of "supplemental" supports plaintiff's position. Supplement is defined as "something added to complete a thing, supply a deficiency or reinforce or extend a whole." *The American College Dictionary*, 1216 (4th ed. 1950).

The fact that the parties negotiated the overall terms and consideration for the transfer of the plaintiff's substantial real estate holdings as a package deal supports a finding that the transfer of CCT should be construed in the light of the general terms of the main agreement. Both documents were dated the same day. CCT was a part of the "New Jersey Division" of the A–S holdings which otherwise passed pursuant to the main agreement. It is true that the language of the attorneys' fees clause relates it to any "failure of Buyer ... to perform ... any agreement *hereunder.*" (Emphasis added). This language, however, does not necessarily and specifically limit itself to the main agreement. The supplemental agreement was a supplement to the main agreement. The aborted sale of CCT to Grace must be understood and construed within the context of the massive sale under the main agreement. I find and conclude that the attorneys' fees clause of the main agreement applies to the breach of the supplemental agreement and I award plaintiffs its "attorneys' fees ... costs and expenses" resulting from this litigation.

■ The affidavits of services submitted by plaintiff's counsel have described the work performed by him in complete detail. Plaintiff's counsel, a member of the bar for 27 years, and a partner in a large Newark law firm, performed his duties with commendable skill, industry and professionalism. The presentation of this case required extensive pretrial investigation, discovery and preparation. Preparation for the liability and damage trials required significant legal research and review of complex financial and accounting questions. The considerable work performed was appropriate and necessary in view of the importance of the case, the responsibility assumed and the numerous factual and legal complexities involved.

The firm of McCarter & English spent a total of 4,452.43 hours on this case up to October 31, 1981. Over this period of time A–S was billed $350,230.84 in fees at the normal hourly rates of various partners and employees of McCarter & English who participated in the management of this case.[4] Disbursements totaled $89,591.40. After a careful review of the affidavits of counsel, I am satisfied that the fees and disbursements were fair, reasonable and justified.[5] I will award plaintiff its fees and disbursements and direct that its counsel submit a final statement for its costs.

### CONCLUSIONS OF LAW

■ The general rule for measuring damages for the breach of a contract for the purchase or sale of real property is that damages are assessed as the difference between the contract price and market value at the time of the breach. *Corbin on Contracts,* § 1098 A (p. 535). Such is the law in New Jersey.[6] *Baerenklau v. Peerless Realty Co.,* 80 N.J.Eq. 26, 83 A. 375 (Ch.1962). Defendant urges application of that rule to this case. Grace points to the aggregate market price of the CCT units as prima facie evidence of market value. See *Sheehy v. Galipeau,* 48 N.J.Super. 95, 137 A.2d 5 (App.Div.1957). Since plaintiff sold the property for an aggregate total of $13,806,695, the market price exceeded the contract price and defendant argues that no damages resulted. Using this measure, even allowing for the additional expense of

---

4. The average hourly rates charged were as follows: Partners, $114.79 to $138.06; Associates, $54.52 to $62.64; Paralegals, $28.64 to $34.93; Summer Associates, $25.67 to $34.93.

5. Defendant raises no argument directed to the reasonableness of the fees or disbursements. Rather, Grace merely argues that the provision in the main agreement regarding fees does not apply to the supplemental agreement.

6. In diversity cases, the choice of law rules of the district court's forum state are controlling.

*Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 494, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey's choice of law rule with respect to damages is that "the state whose law governs the substantive legal questions also governs the prejudgment interest issue." *Draper v. Airco, Inc.,* 580 F.2d 91, 98 (3rd Cir. 1981) relying on *Busik v. Levine,* 63 N.J. 351, 307 A.2d 571 (1953). Accordingly, the damage and interest issues are governed by New Jersey law as were the liability issues.

$4,088,220 which plaintiff incurred to complete and market the property, plaintiff would appear to have suffered either damages of only $3,279 (using plaintiff's book value figure) or no damages (using defendant's book value figure).

■ Defendant calls the court's attention to the 1975 real estate tax assessment on CCT of over eleven million dollars as another indication of the market value of CCT and further demonstration that market value exceeded contract price.[7]

None of defendant's arguments come to grips with plaintiff's rather unique injury in this case, however. They ignore the value of the loss of the use of a large sum of money for an extended period of time.

Courts have not been oblivious of the time value of money. One court acknowledged that "in our society today, money is a commodity with a legitimate price on the market and loss of its use . . . should be compensable." *Shapiro v. Kansas Public Employees Retirement System*, 216 Kan. 353, 532 P.2d 1081, 1084 (1975).

■ Though articulated in many different ways, the courts are mindful of the value of time in calculating the compensation for a damages award. As the court stated in *U. S. v. Atlantic Refining Co.*, 85 F.2d 427, 429 (3rd Cir. 1936), "delay in . . . [receiving] compensation is an element in determining the damages . . . and an award made on one date is not the equivalent of an award made at an earlier date." The delayed compensation is a greater figure and "delay . . . enters into the late award as an element of loss." See, Harpum, *Specific Performance With Compensation as a Purchaser's Remedy—A Study in Contract and Equity*, 40 Camb.L.J. 47 (1981); Oakey, *Pecuniary Compensation For Failure to Complete a Contract for the Sale of Land*, 39 Camb.L.J. 58 (1980).

■ The aim of awarding damages is compensation. The goal is:

" . . . to put the injured party in as good a position as he would have had if performance had been rendered as promised. It goes without saying that this aim can never be exactly attained. The position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve." [It] must determine what additions to the injured party's wealth (expected gains) have been prevented by the breach and what subtractions from his wealth (losses) have been caused by it.

*Corbin on Contracts*, § 992, p. 5–6.

This case is difficult because the damages are not certain and the facts of the case do not provide guideposts to the proper techniques for the measurement of damages. The New Jersey Appellate Division faced the problem of uncertainty in damage awards in the recent case of *Donovan v. Bachstadt*, 181 N.J.Super. 367, 437 A.2d 728 (App.Div.1981), which considered whether costs for increased mortgage interest was recoverable as damages. That court alluded to *Sandler v. Lawn-A-Mat*, 141 N.J.Super. 437, 454, 358 A.2d 805 (App.Div.) certif. den., 71 N.J. 503, 366 A.2d 658 (1976) where Judge Larner said that:

Mere difficulty or lack of certainty in the proof or finding of the quantum of damages does not inhibit an award to the successful party. As noted by the Supreme Court in *Tessman v. Grosner*, 23 N.J. 193, 128 A.2d 467 (1957):

If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient. *Wolcott Johnson & Co. v. Mount*, 36 N.J.L. 262, 272 (Sup.Ct., 1873), affirmed 38 N.J.L. 496 (§§ A. 1875). The rule relating to the uncertainty of damages applies to the uncertainty as to the fact

---

7. Under N.J.S.A. 54:4–2.25 as construed by *Englewood Cliffs v. Estate of Allison*, 69 N.J.Super. 514, 174 A.2d 631 (App.Div.1961), the tax assessment value of a piece of real estate must be the market value of the property. N.J.S.A. 54:4 2.25 provides in relevant part:

"All real property subject to assessment and taxation for local use shall be assessed according to the same standard of value, which shall be the true value of such real property . . ."

of damage and not to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. (citations omitted)

The *Donovan* court discussed the trend toward flexibility in assessing damages by referring to the approach discussed in Section 352 of the Second Restatement of Contracts, where it is stated that:

Doubts are generally resolved against the party in breach. A party who has, by his breach forced the injured party to seek compensation in damages should not be allowed to profit from his breach ...

Restatement (Second) of Contracts § 352 (1981).

*Donovan* also draws upon the "more flexible, less exact approach" of the Uniform Commercial Code in measuring damages. This approach is revealed in the Code's section on liberal administration of remedies, N.J.S.A. 12A:1–106(1), and in its language in Comment 4 to Section 2–715 that "[l]oss may be determined in any manner which is reasonable under the circumstances." N.J.S.A. 12A:2–715 (Comment 4).

■ Finally, the *Donovan* case quotes from the New Jersey Supreme Court's decision in this state's version of *Marvin v. Marvin*, *Kozlowski v. Kozlowski*, 80 N.J. 378, 403 A.2d 902 (1979), to the effect that:

While the damages flowing from defendant's breach of contract are not ascertainable with exactitude, such is not a bar to relief. Where a wrong has been committed, and it is uncertain that damages have resulted, mere uncertainty as to the amount will not preclude recovery— courts will fashion a remedy even though the proof on damages is inexact. [citations omitted]

Thus it appears that uncertainty alone should not deter me from fashioning an award which would place plaintiff in as favorable a position as it would have been in had defendant not defaulted in its obligation. *See, Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 327 (5th Cir. 1981) reh. den., 642 F.2d 1210.

■ Defendant contends that plaintiff's damage claim is actually a claim for prejudgment interest which is governed by the applicable New Jersey prejudgment interest rule.[8] Defendant argues that inasmuch as that rule was only recently amended in September 1981 increasing the statutory rate of interest from 8% to 12%, the plaintiff's damages, if any, should be assessed at 8% prior to September 1981 and 12% after that.[9] Also, defendant points out that interest is to be calculated, according to the terms of the rule, as simple rather than compound interest.

I reject the contention that this rule controls the assessment of damages in this case. Certainly, the rule providing for prejudgment interest is a tool to be used to assure that any recovery by a prevailing party actually succeeds in making it whole. It indemnifies a "plaintiff for the loss of what the monies due him would presumably have earned if payment had not been refused." *Rova Farms Resort v. Investors Insurance Co.*, 65 N.J. 474, 506, 323 A.2d 495 (1974). It also deters an obligor from delaying an offer of settlement in the hope that the delay will enable it to exploit the earning power of the money at stake. "The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question, and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of

8. 4:42–11 Interest; Rate on Judgments; in Tort Actions

(a) Rate. Judgments, awards and orders for the payment of money and taxed costs shall bear simple interest on the amount of the award at 12% per annum from the date of entry, except as otherwise ordered by the court and except as may be otherwise provided by law.

9. Such a result would be inappropriate inasmuch as the New Jersey courts have construed the interest rule to be retroactive. *Simons v. Saaz*, 147 N.J.Super. 143, 370 A.2d 889 (App. Div.1977); *see also Kotzian v. Barr*, 152 N.J.Super. 561, 564 n.1, 378 A.2d 256 (App.Div.1977), *rev'd on other grounds*, 81 N.J. 360, 408 A.2d 131 (1979).

monies to which the plaintiff is found to have been earlier entitled." *Id. Rova Farms, supra*, 65 N.J. at 506, 323 A.2d 495.

■ Though this principle is applicable to the controversy between A. S. and Grace, its application in this case is different. The question here is whether an award for damages in a contract case can be fashioned in reliance on the time value of money when plaintiff has received the full contract price as the result of its efforts to mitigate the damages. I find that I must answer that question in the affirmative notwithstanding the guarantee of some imprecision in results.

Defendant further contends that under New Jersey law interest is not awarded as a matter of course, but in accordance with the principles of equity. *Bak-A-Lum Corp. of America v. Alcoa Building Products*, 69 N.J. 123, 351 A.2d 349 (1976). Defendant points to the $20,000 payment plaintiff made to defendant's title insurance carrier prior to the purported contract closing date as a questionable act calculated to seek an unfair advantage. Defendant refers to my opinion after the liability trial and translates my allusion to the payment as "troublesome" and as "unconvincingly explained" as a characterization of plaintiff's "unclean hands." I do not so construe plaintiff's position. Plaintiff made an agreement with defendant to sell its sizeable real estate holdings throughout the country at a negotiated price. The one parcel which developed problems was Channel Club Tower and it alone was excluded from the main sale. The original intent, however, was for all of the properties to be transferred at once. Only the electrical power problem kept CCT from passing along with the other properties. That problem was subsequently cured. The tidelands issue and the water and utility easements on the CCT property were conditions which developed significance after the main sale had been effectuated. By that time, the sluggishness of the condominium market had revealed itself. I

concluded that defendant sought an avenue of escape from this purchase to avoid an unprofitable investment. By January 1975, plaintiff realized that defendant wanted to back out of this purchase and as desperately sought to avoid being left "holding the bag." The $20,000 payment plaintiff made to Pioneer National Title Insurance Company must be viewed ultimately as an additional premium charge for title insurance coverage.

■ As discussed in my earlier opinion, I am satisfied that plaintiff's title was marketable, and that defendant's objections were false and contrived. Within the context of this investment transaction defendant wrongfully rejected title to CCT, and plaintiff's actions do not preclude its recovery in equity.

Accordingly, I find that plaintiff is entitled to damages in an amount to be calculated on the involuntary loan theory through the date judgment is entered. The involuntary loan theory will be calculated at an interest rate of 2% points above Chase Manhattan prime.* This award provides fair and reasonable damages to plaintiff for defendant's use of the money over an extended period of time, yet it does not lock defendant into the fiction of the 1975 loan.

■ I have considered plaintiff's argument that post-judgment interest should be permitted on the final judgment at the Chase Manhattan prime rate compounded monthly. While I am not oblivious of the fact that a 12% post-judgment interest rate is less than a compensatory rate of interest on an award of this magnitude, there is nothing otherwise unusual about the facts of this case to warrant deviation from the promulgated court rule. Post-judgment interest is to be calculated at 12% simple interest.

---

* As of December 30, 1981 this award would be $4,301,863 if the prime rate were 20.00 as of that date.