

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-22-1998

# Liberty v. Ford Mtr Co

Precedential or Non-Precedential:

Docket 96-5762

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Liberty v. Ford Mtr Co" (1998). *1998 Decisions.* Paper 20.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/20

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 22, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-5762, 97-5189 and 97-5190

LIBERTY LINCOLN-MERCURY

v.

FORD MOTOR COMPANY,
        Appellant in No. 96-5762

LIBERTY LINCOLN-MERCURY, INC.

v.

FORD MOTOR COMPANY,
        Appellant in No. 97-5189

LIBERTY LINCOLN-MERCURY, INC.,
        Appellant in No. 97-5190

v.

FORD MOTOR COMPANY

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 95-3121)

Argued December 11, 1997

BEFORE: GREENBERG, ROTH, and SEITZ,
Circuit Judges.

(Filed: January 22, 1998)

Dennis R. LaFiura (argued)
Pitney, Hardin, Kipp & Szuch
P.O. Box 1945
Morristown, NJ 07932-0950

Michael R. Feagley
Mayer, Brown & Platt
190 S. LaSalle Street
Chicago, IL 60603-3441

John J. Sullivan
Robert L. Bronston
Mayer, Brown & Platt
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-1882

 Attorneys for Appellant and Cross
 Appellee Ford Motor Company

Norman I. Klein
Goldman, Carlett
Garrison & Klein
1135 Clifton Ave.,
Clifton, NJ 07013

Eric L. Chase (argued)
Genevieve K. LaRobardier
Bressler, Amery & Ross, P.C.
P.O. Box 1980
Morristown, NJ 07962

 Attorneys for Appellee and Cross
 Appellant Liberty Lincoln-Mercury,
 Inc.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Defendant Ford Motor Company ("Ford") appeals from an order of the district court dated March 13, 1996, entered March 15, 1996, granting partial summary judgment in

favor of plaintiff Liberty Lincoln-Mercury, Inc. ("Liberty") on the grounds that Ford's assessment of a dealer-parity surcharge ("DPS") violated the New Jersey Franchise Practices Act, N.J. Stat. Ann. S 56:10-15(a) (West Supp. 1997). Ford also appeals from the district court's order of September 19, 1996, entered September 23, 1996, amending the March 13 order nunc pro tunc to preclude Ford from altering certain practices that were in effect as of the date of the March order. Liberty cross appeals from the district court's March 13, 1996 dismissal of its claim alleging illegal price discrimination under the Robinson-Patman Act, 15 U.S.C. S 13(a), and from the portions of the district court's February 26, 1997 final order entered February 27, 1997, rejecting Liberty's claim for damages incurred before December 1991, denying recovery of certain fees, and awarding prejudgment interest at the rates set forth in New Jersey Court Rule 4:42-11.

The district court had jurisdiction over Liberty's state law claim pursuant to 28 U.S.C. S 1332 based on diversity of citizenship and the requisite amount in controversy, and over Liberty's federal law claim under 28 U.S.C. S 1331. This court's jurisdiction rests on 28 U.S.C. S 1291 based on the district court's entry of the final order dated February 26, 1997, and entered February 27, 1997.[1] For the reasons that follow, we will reverse the district court's September 19, 1996 order, and will vacate the district court's order awarding attorneys' fees and remand that issue for reconsideration. We otherwise will affirm.

---

1. Ford initially filed an interlocutory appeal from the district court's September 19, 1996 order pursuant to 28 U.S.C. S 1292(a)(1), which provides that "the courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts . . . granting . . . injunctions . . . ." By order of this court the interlocutory appeal, which was docketed as number 96-5762, was consolidated with Ford's appeal in number 97-5189 and Liberty's cross appeal in number 97-5190 from the district court's final order. The district court on April 25, 1997, entered a supplemental final order dated April 22, 1997, which is not at issue in this appeal.

3

II. FACTUAL AND PROCEDURAL HISTORY

On March 11, 1976, Ford and Liberty entered into a franchise agreement by executing Ford's standard "Lincoln and Mercury Sales and Service Agreements." Pursuant to the agreement, Ford, a motor vehicle manufacturer and franchisor, sells vehicles at wholesale prices to Liberty, which in turn sells them to consumers at retail prices. The retail vehicle sales are accompanied by a warranty issued by Ford to the consumer, guaranteeing that Ford will replace certain systems or parts in the vehicle free of charge. See app. at 38; 173.

Under the standard franchise agreement, a franchisee-dealer such as Liberty must perform warranty repairs on any vehicle brought to its dealership regardless of where the owner purchased the vehicle. Ford then must reimburse the dealer for the parts and labor associated with the warranty repairs. From 1976 until 1991, Ford reimbursed Liberty for parts used in warranty repairs pursuant to a standard nationwide reimbursement formula. Under the relevant version of that formula, Ford reimbursed dealers at 30-40% above their cost for parts depending on the model of the vehicle repaired. See id. at 115.

On December 12, 1991, Liberty wrote to Ford, asking to be reimbursed for warranty parts at its retail rate of 77% above its cost pursuant to the New Jersey Franchise Practices Act ("NJFPA"), which provides that a motor vehicle franchisor "shall reimburse" its franchisee for parts used in warranty repairs at the franchisee's "prevailing retail price," provided that the retail price is "not unreasonable." N.J. Stat. Ann. S 56:10-15(a). See app. at 286. Ford responded on January 17, 1992, that it intended "to offset[any] parts mark-up above 30%." Ford explained that it would "estimate the incremental cost to [Ford] of the higher mark-up" Liberty had demanded and would provide Liberty "a menu of items" on Liberty's account from which the costs could be recovered. Ford informed Liberty that it would adjust the amount of its recovery charges "periodically . . . to ensure that only incremental costs are recovered." Id. at 295.

4

On July 7, 1992, after several months of correspondence, Ford agreed to reimburse Liberty at Liberty's claimed rate of 77% above cost although Ford "continue[d] to believe that a retail markup of 77% is unreasonably high." App. at 308. On October 1, 1992, Ford reminded Liberty "that there would be cost recovery," and informed Liberty that it was "reviewing the nature of the recoveries that will be implemented." Id. at 319. Ford then wrote to Liberty on November 5, 1992, confirming its agreement to reimburse Liberty at a 77% markup retroactive to December 12, 1991, the date Liberty first demanded retail-rate reimbursement, and announcing that Ford would recover the cost of paying the incremental reimbursement through a "dealer parity surcharge." Id. at 321.

Ford explained,

> [a]s you know, parity between dealers, and parity in the overall economic relationship between Ford and its dealers, is essential. It is necessary for Ford to maintain dealer parity, notwithstanding Ford's acceptance of your request to be reimbursed for warranty parts at a markup exceeding the mark-up which Ford extends uniformly to all dealers nationally.
>
> To maintain that parity, and to ensure fairness to the overwhelming majority of dealers who are satisfied with . . . a uniform warranty parts reimbursement mark-up, and to recover our increased costs . . . . [c]osts incurred through today will be divided by the total number of vehicles in your dealership's inventory and . . . `in-transit' to your dealership . . . . The quotient will constitute a dealer parity surcharge to your wholesale price for each such vehicle.

Id. Ford informed Liberty that after this initial cost recovery, "[i]ncremental costs incurred during each period . . . will be divided by the total number of vehicles invoiced . . . . The quotient will constitute the surcharge to your wholesale vehicle price for each such vehicle." Id. Ford assured Liberty that, [i]n the event the total monthly surcharge differs from the incremental [reimbursement] costs incurred by Ford, the aggregate amount of any excess or shortfall to the surcharge . . . will be netted against the

5

Costs used to determine the surcharge for the immediately subsequent Billing Period." Id. at 322.

In correspondence dated December 21, 1992, Liberty requested additional reimbursements to supplement the below-retail reimbursements it had received for warranty parts it installed between 1986 and December 12, 1991. See id. at 326. Ford rejected that claim. See id. at 346.

On October 5, 1992, Liberty filed a class action in federal district court for the District of New Jersey on behalf of 38 New Jersey Lincoln-Mercury dealers, alleging that Ford's warranty reimbursement practices violated the NJFPA. On May 14, 1993, the district court, finding that the dealers' claims required a "part-by-part, sale-by-sale" analysis of each dealer's retail rate, denied the motion for class certification for lack of the requisite commonality among the dealers' claims. Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp., 149 F.R.D. 65, 76 (D.N.J. 1993) ("Liberty I"). The court later dismissed Liberty I without prejudice by consent of the parties.

Liberty then filed this action on June 30, 1995. In its complaint and amended complaint Liberty alleged that Ford's imposition of the DPS violated the NJFPA's mandate that Ford reimburse Liberty for warranty parts at Liberty's prevailing retail price. Liberty also alleged that by imposing the DPS on Liberty but not on its competitors, Ford had engaged in unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. S 13(a).2

Liberty moved for summary judgment as to liability on both claims and Ford moved to dismiss Liberty's price discrimination claim. By order dated March 13, 1996, the district court granted Liberty's motion for summary judgment as to its NJFPA claim and granted Ford's motion to dismiss Liberty's price discrimination claim. The district court found that Ford was "engaged in a shell game, the purpose of which is to avoid, altogether, the costs of complying with the NJFPA." Slip op. at 9. Finding that the DPS, by effectively reducing Liberty's reimbursements from

_____

2. Liberty consented to the dismissal of several other claims which are not at issue in this appeal.

6

Liberty's retail rate to Ford's standard rate, "essentially nullified [Ford's] compliance and created an end-run around the Act," the district court concluded that it "would be formalistic, in the extreme," to find that Ford had paid Liberty the requisite reimbursement "when [Ford] charges back the very benefits which the Act intends to confer." Id. at 8-9. The court thus held that the DPS violated the "clear language of the NJFPA" by denying Liberty reimbursement at its retail rate. Id. at 11. The court concluded, however, that because the DPS placed Liberty in the same economic position as competitors who received only standard reimbursements at 30-40% above cost, it did not give rise to a price discrimination claim under the Robinson-Patman Act. See id. at 12-13.

Thereafter Ford discontinued the DPS, and on April 29, 1996, wrote to all New Jersey dealers announcing new policies for processing retail-rate reimbursement claims. The policies required dealers to document their claimed retail prices as to each warranty part by attaching retail customer repair orders for the same part installed in similar vehicles within the preceding six months. See app. at 513, 516. Ford also informed the dealers that "payment of warranty parts reimbursement at levels higher than [standard] reimbursement levels will be recovered . . . as with other regulatory compliance costs." Id. at 514.

On May 15, 1996, Liberty submitted a request for retail-rate reimbursement for warranty parts installed during April and May 1996. Ford rejected the request for failure to satisfy Ford's new documentation requirements. See app. at 736-42. On June 20, 1996, Liberty filed a "Motion to Enforce the Order of March 13, 1996" challenging Ford's new policies as imposing insurmountable burdens designed to prevent Liberty from receiving retail-rate reimbursement, in violation of the NJFPA and the district court's March order. Liberty sought sanctions and an order enjoining Ford from implementing the new requirements.

Ford responded that the issues raised in Liberty's Motion to Enforce were beyond the scope of the complaint and the March order, which had addressed only the legality of the DPS and were silent as to the proper methods for establishing a dealer's retail rate. Ford contended that its

7

new policies were appropriate in light of Liberty I's pronouncement favoring a "part-by-part, sale-by-sale" analysis of each dealer's retail rate, 149 F.R.D. at 76, and sought discovery and the opportunity to develop a factual record regarding the nature of the new policies and the burdens they entailed. See app. at 729-30.

The district court, without allowing discovery or holding an evidentiary hearing, held on September 19, 1996, that in adopting its new reimbursement policies Ford had "ignored or evaded" the "clear thrust" of the March opinion. Slip op. at 1. The court found that the new procedure "appears to be onerous in the extreme and designed to frustrate any attempt to obtain statutory reimbursement . . . at the dealer's prevailing retail rate." Finding, however, that the terms of the March order were not "explicit," the court denied Liberty's Motion to Enforce, but amended the March order nunc pro tunc to forbid Ford from altering its prior reimbursement procedure absent Liberty's consent or leave of the court. The court also enjoined Ford from"any further or other financial imposition on . . . Liberty . .. as a recoupment" of Ford's NJFPA compliance costs. Slip op. at 2-3.

Liberty also moved for summary judgment as to the issues of damages, interest, costs and fees. In afinal order dated February 26, 1997, and supplemental final order dated April 22, 1997, the district court granted Liberty's motion in part, awarding Liberty a total of approximately $800,000 in damages, attorneys' fees, costs and prejudgment interest. This appeal and cross appeal followed.

III. DISCUSSION

A. The New Jersey Franchise Practices Act

1. Statutory Language

The New Jersey Franchise Practices Act provides that:

> [i]f any motor vehicle franchise shall require or permit motor vehicle franchisees to . . . provide parts in

8

> satisfaction of a warranty issued by the motor vehicle
> franchisor . . . [t]he motor vehicle franchisor shall
> reimburse each motor vehicle franchisee . . . for such
> parts as are supplied, in an amount equal to the
> prevailing retail price charged by such motor vehicle
> franchisee for such . . . parts in circumstances where
> . . . such parts [are] supplied other than pursuant to
> the warranty; provided that such motor vehicle
> franchisee's prevailing retail price is not unreasonable
> when compared with that of [other franchisees] from
> the same motor vehicle franchisor for identical
> merchandise . . . in the geographic area in which the
> motor vehicle franchisee is engaged in business . . . .

N.J. Stat. Ann. S 56:10-15(a). We must decide whether the district court erred in entering summary judgment in favor of Liberty on the grounds that Ford's "surcharge regime violates the clear language of the NJFPA." Slip op. at 11. We review both the district court's interpretation of the NJFPA and its entry of summary judgment de novo, construing the NJFPA as we believe that the New Jersey Supreme Court would construe it and viewing the record in the light most favorable to Ford. See Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 516 (3d Cir. 1997).

While the New Jersey courts have not interpreted the relevant statutory language dictating that a "franchisor shall reimburse" its franchisee for warranty parts at "the prevailing retail price," under New Jersey law"[i]t is a cardinal rule of statutory construction that the language of the statute should be given its ordinary meaning and construed in a common sense manner to accomplish the legislative purpose." N.E.R.I. Corp. v. New Jersey Highway Auth., 686 A.2d 328, 335 (N.J. 1996) (citations and internal quotations omitted). Applying an ordinary and common sense definition of the relevant statutory language requiring Ford to reimburse Liberty at retail rates, we conclude that Ford's assessment of the DPS, which automatically reduced the reimbursements Liberty received to below retail levels, violated the plain language of the NJFPA.

According to Ford, because the NJFPA regulates "a narrow aspect of the franchisor-franchisee relationship,"

9

dictating only the rate of reimbursement for warranty parts, and "is silent regarding wholesale prices," the DPS which Ford added to Liberty's wholesale vehicle prices falls outside the purview of the NJFPA. Br. at 14-15. Ford contends that the district court, in finding that the DPS violated the NJFPA, "read into the statutory scheme a remarkably intrusive and completely unstated requirement that Ford silently bear the full cost of compliance," depriving Ford of "the freedom to control its wholesale pricing structure without . . . support in the language of the statute." Id. at 20.

We disagree. The district court did not forbid Ford from adopting policies to recover the costs of complying with the NJFPA; nor did it forbid methods of cost recovery involving wholesale prices. The court simply held that while some "methods of cost-recovery are permissible . . . .[Ford's] method certainly is not." Slip op. at 9. Even though the court, in reaching this conclusion, did not delineate the distinctions between the DPS and permissible cost-recovery systems, those distinctions are apparent from the record before us.

As Ford explained to Liberty in setting forth its method for calculating the DPS, "incremental [warranty reimbursement] costs incurred [by Ford] during each period . . . will be divided by the total number of vehicles invoiced . . . that month." App. at 321. Accordingly, the DPS bore no economic relationship to Liberty's wholesale vehicle purchases, but rather was exacted as an automatic result of, and in direct proportion to, Liberty's incremental warranty reimbursement claims. Although Ford described the DPS as a vehicle price surcharge and attributed a portion of it to each vehicle on Liberty's invoice, the total amount of the surcharge neither would increase if Liberty purchased more vehicles nor would decrease if Liberty purchased fewer. See id. at 308, 321. Thus, looking to the practical operation of the DPS rather than to the nomenclature Ford used to describe it, we conclude that the DPS, the amount of which depended solely and directly on Liberty's warranty reimbursement claims, functioned not as a wholesale vehicle price term carried out through unregulated vehicle sales transactions, but rather as a

10

warranty reimbursement policy that automatically eliminated any reimbursement beyond Ford's standard rate resulting, as Liberty argues, in "no payment at retail." Br. at 23.

Because the DPS was assessed as an inevitable consequence of incremental reimbursement claims and not through separate, unregulated transactions, Ford's reliance on Acadia Motors, Inc. v. Ford Motor Co., 44 F.3d 1050 (1st Cir. 1995), is misplaced. Acadia held that a Maine retail reimbursement statute similar to the NJFPA did not preclude Ford from imposing a wholesale vehicle price surcharge to recover the costs of reimbursing Maine dealers at retail rates rather than at Ford's standard rate. 3 The Acadia court found that "[n]othing in the[statutory] language . . . prohibits a manufacturer from increasing vehicle prices in order to recover its increased compliance costs. The statute says nothing about wholesale or retail prices, and apparently leaves the manufacturer free to increase wholesale prices." Id. at 1056. Thus, the Acadia court concluded, a restriction against wholesale price increases would improperly establish "a rule unsupported by state statute." Id. at 1057.4

We agree with Acadia's holding that the statutes at issue do not preclude cost-recovery systems effected through wholesale vehicle price increases, but reject Ford's

_____

3. The Maine statute at issue in Acadia provides that:

> [i]f a motor vehicle franchisor requires or permits a motor vehicle
> franchisee to . . . provide parts in satisfaction of a warranty created
> by the franchisor, the franchisor . . . shall reimburse the franchisee
> for any parts so provided at the retail rate customarily charged by
> that franchisee for the same parts when not provided in satisfaction
> of a warranty.

10 Me. Rev. Stat. Ann. tit. 10, S 1176 (West 1994).

4. In holding that the district court had fashioned a rule unsupported by the statutory language, Acadia admonished that "federal courts must take great caution when blazing new state-law trails." 44 F.3d at 1057 (citations and internal quotations omitted). This principle, which we recognize as well, see Leo v. Kerr-McKee Chem. Corp., 37 F.3d 96, 101 (3d Cir. 1994), is not implicated in this case where the district court properly applied the plain statutory language.

11

contention that the DPS constitutes such a system. 5 In Acadia, Ford reimbursed all Maine dealers at retail rates and assessed a "warranty parity surcharge" ("WPS") that added $160 to the price of every vehicle sold to Maine dealers "to recover [the] increase in its costs of doing business in Maine." 44 F.3d at 1052. The total amount of the surcharge imposed on each dealer was "based on the number of cars sold, without regard to whether the dealer actually performed warranty work in that month." Id. at 1053.

Thus, in contrast to the DPS, Ford did not impose the WPS as a consequence of a dealer's warranty reimbursement claims, but instead assessed it as a result of a separate vehicle purchase transaction. Because the total amount of charges a dealer would incur under the WPS scheme depended on the "number of cars sold" and not on the dealer's reimbursement amounts, the WPS operated as a bona fide wholesale price term that resulted from and accrued in proportion to unregulated vehicle sales transactions rather than regulated warranty reimbursement transactions.

Contrary to Ford's assertion that "this factual difference . . . is completely irrelevant," reply br. at 11, we find the distinction to be critical. When a dealer incursfinancial burdens upon making a retail-rate warranty reimbursement claim, the dealer, in effect, is compensated for the warranty transaction at a below-retail rate, which the NJFPA forbids. When, however, the dealer incurs financial burdens as a result of other transactions, those burdens may reduce the return the dealer receives on those transactions, but the terms of those transactions are unregulated. Therefore the decreased compensation associated with those transactions

_____

5. Where, as here, a New Jersey court has not construed the relevant statutory language, New Jersey courts seek guidance from cases construing similar statutes in other jurisdictions. See Neptune T.V. & Appliances Serv., Inc. v. Litton Microwave Cooking Prods. Div., 462 A.2d 595, 599 (N.J. Super. Ct. App. Div. 1983). Acadia, 44 F.3d 1050, is the only such case of which we are aware.

12

does not violate the statute as does as a below-retail rate of compensation for installing warranty parts.6

In light of these differences between the WPS at issue in Acadia and the DPS at issue in this case, Acadia's approval of the "chosen mechanism for cost recovery" in that case, 44 F.3d at 1058, has little bearing on our examination of the decidedly different cost-recovery mechanism in this case. Because the DPS, unlike the WPS, did not function as a wholesale price increase effected through vehicle sales transactions beyond the regulatory reach of the NJFPA, we find Acadia inapposite and reject Ford's contention that Acadia compels us to find the cost-recovery method before us permissible under the NJFPA. Based upon the uncontroverted facts regarding the structure and operation of the DPS, we find that Ford's assessment of the DPS, by automatically reducing Liberty's reimbursements to below-retail rates, violates the NJFPA's clear mandate that the franchisor "shall reimburse" the franchisee for warranty

_____

6. The distinction holds practical as well as statutory significance. Since a dealer, under the standard franchise agreement, must perform all warranty repairs brought to its dealership and cannot charge customers for those repairs but instead must accept the franchisor's standard reimbursement, the dealer cannot control the volume, timing or profitability of those repairs. Thus dealers cannot mitigate losses they may incur in performing warranty repairs by controlling the terms of those transactions as they can in their other operations. Because losses incurred in the context of warranty transactions impose these unique hardships on dealers, so do cost-recovery systems that assess charges as a result of and in proportion to those transactions.

While Ford attempts to obscure this reality by arguing that a dealer can redistribute warranty transaction losses through its other operations, see reply br. at 11 & n.2, this argument ignores the fact that a dealer neither can predict nor can control the proportion of its operations it will be required to devote to performing mandatory warranty repairs, and thus could recover fluctuating warranty losses only by constantly readjusting retail prices, which would be economically infeasible. Thus, a rule protecting dealers fromfinancial burdens incurred through warranty transactions but not through other transactions not only comports with the statutory scheme dictating the terms only of the former, but also recognizes the unique hardships associated with warranty losses due to the dealer's lack of control over the terms of warranty transactions.

13

parts "in an amount equal to the prevailing retail price."
N.J. Stat. Ann. S 56:10-15(a).7

In arguing that its DPS scheme comports with the
NJFPA, Ford essentially argues that to achieve compliance
with the retail reimbursement mandate, a franchisor only
need record a nominal retail-rate credit to the dealer, even
if an offsetting debit ensures that the dealer never receives
any reimbursement at the retail rate. Ford's definition of
statutory compliance would require us to view its initial
retail-rate reimbursement in isolation from the surcharge
that inevitably offsets that reimbursement, contrary to the
undisputed evidence that the offset followed ineluctably
from the incremental reimbursement and relegated Liberty
to the same position as if it initially had received only the
standard reimbursement.8

Ford's strained construction of the NJFPA, which the
district court properly rejected as "formalistic, in the
extreme," slip op. at 9, would ascribe paramount
importance to illusory transactions recorded on a dealer's
invoice while ignoring the reality of whether the franchisor
actually reimbursed its franchisee "in an amount equal to
the prevailing retail price" as the statute requires. Because
a statute permitting illusory transactions with no economic
effect would serve no legislative purpose, we find no
indication that the New Jersey Supreme Court would adopt
Ford's construction of the NJFPA contrary to that court's
pronouncement that statutes be construed in "a common

_____

7. Because the surcharge in this case resulted automatically from
Liberty's incremental reimbursement claims and because the total
amount of the surcharge depended directly on the amount of those
claims, we need not decide the legality under the NJFPA of cost-recovery
methods that depend on a dealer's reimbursement transactions in some
less direct manner.

8. Indeed, in maintaining that the surcharge achieved "parity" between
Liberty and competitors who received only standard reimbursements,
Ford effectively recognizes that the DPS consigned Liberty to the same
position as dealers who were reimbursed at Ford's rates which were
statutorily deficient as to Liberty. See app. at 321 ("[P]arity between
dealers . . . is essential. . . . To maintain that parity . . . and to
recover
our increased costs . . . the Costs will be recovered [through] a dealer
parity surcharge.").

14

sense manner to accomplish the legislative purpose." N.E.R.I Corp., 686 A.2d at 335. In fact, we are quite confident that that court would reject Ford's NJFPA argument.

Construing the statutory terms according to their plain and ordinary meaning as is required under New Jersey law, see Service Armament Co. v. Hyland, 362 A.2d 13, 16 (N.J. 1976); Cutler v. Borough of Westwood, 685 A.2d 44, 47 (N.J. Super. Ct. App. Div. 1996), certif. denied, 693 A.2d 112 (N.J. 1997), we conclude that the term "reimburse," which is defined as "[t]o pay back, to make restoration, to repay that expended; to indemnify, or make whole," BLACK'S LAW DICTIONARY 1287 (6th ed. 1990), is not satisfied by transactions that fail to result in actual payment or restoration of the requisite sums. Accordingly we, like the district court, hold that in reducing Liberty to "the same position as if it were reimbursed the standard thirty to forty percent above cost," slip op. at 10, the DPS scheme violated "the clear language of the NJFPA" by denying Liberty reimbursement at its prevailing retail rate. Id. at 11.

2. Legislative Purpose

Because the district court properly construed the NJFPA "as it is written [and] . . . not according to some unexpressed intention," Unsatisfied Claim & Judgment Fund Bd. v. New Jersey Mfrs. Ins. Co., 637 A.2d 191, 193 (N.J. Super. Ct. App. Div.), aff'd, 649 A.2d 1243 (N.J. 1994), we find no merit in Ford's contention that the district court erred by relying on legislative history to expand the NJFPA beyond the scope of its plain statutory language. See br. at 16. The legislative history, however, clearly does support a statutory interpretation that prohibits spurious transactions which ultimately fail to result in reimbursement at the dealer's retail rate.

The New Jersey courts have held that the NJFPA is a remedial statute intended to equalize the disparity of bargaining power in franchisor-franchisee relations. See Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc., 680 A.2d 618, 626 (N.J. 1996) (recognizing NJFPA's "basic legislative objectives of protecting franchisees from the

15

superior bargaining power of franschisors"); Tynan v.
General Motors Corp., 604 A.2d 99, 100 (N.J. 1992)
(adopting reasoning of dissent below stating that"[t]he
Franchise Practices Act is remedial in purpose [and]
focuses on the need to protect franchisees from inequitable
treatment by economically more powerful franchisors")
(citing Tynan v. General Motors Corp., 591 A.2d 1024, 1035
(N.J. Super. Ct. App. Div. 1991) (Cohen, J., dissenting in
part)); Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co., 432
A.2d 48, 52-54 (N.J. 1981) (discussing "disparity in . . .
bargaining power" addressed in NJFPA).9  Under New Jersey
law, remedial statutes must be construed broadly to give
effect to their legislative purpose. See Lemelledo v.
Beneficial Management Corp., 674 A.2d 582, 585 (N.J.
Super. Ct. App. Div. 1996), aff'd, 696 A.2d 546 (N.J. 1997);
Sabella v. Lacey Township, 497 A.2d 896, 898 (N.J. Super.
Ct. App. Div. 1985).

The motor vehicle franchise provisions at issue, which
the legislature added to the NJFPA in 1977, were "designed
to remove the franchisor's present opportunity to isolate
himself from the warranty he issues." Legislative Statement,
L. 1977, c. 84, S 3, Assembly No. 1956 (May 24, 1976)
("Legis. Statement"). In enacting the retail reimbursement
requirement, the New Jersey legislature expressed its intent
to "offer[ ] protection to the competent retailer against
arbitrary actions by manufacturers who too often hold a
life-and-death power over his business and his ability to
serve his customers." Id. In light of these statements
indicating an intent to shift responsibility toward
franchisors who issue warranties and to protect dealers in
their transactions with franchisors, we agree with the
district court that a construction of the NJFPA permitting
machinations which ultimately fail to afford the dealer
reimbursement for warranty parts at its retail rate would
"fly in the face of the intent of the New Jersey legislature

_____

9. In a 1989 amendment to the NJFPA adopted after the 1977 provision
at issue, the New Jersey legislature explicitly codified its concern over
the "inequality of bargaining power . . . between motor vehicle
franchisors and motor vehicle franchisees." See N.J. Stat. Ann. S 56:10-
7.2(b).

16

. . . and would undermine the purpose of the Act." Slip op. at 11.

Ford attempts to diminish the significance of the 851<!>legislative history by arguing that the New Jersey legislature identified several consumer protection concerns before expressing its intent to protect dealers. See reply br. at 6 (citing Legis. Statement). The legislature, however, did not indicate the relative importance of these concerns. We therefore find no relevance in the order in which the legislature articulated them. In any event, the stated consumer protection concerns of ensuring that warranty customers receive the same service as retail customers and that warranty work be performed according to generally acceptable standards, see Legis. Statement, are aligned closely with the intent to protect dealers from arbitrary actions by franchisors. Dealers who receive below-retail compensation for installing warranty parts are discouraged from devoting the same resources to installing those parts as they devote to installing those for retail customers.10 Thus, the consumer protection concerns behind the NJFPA further support a statutory interpretation which focuses on the compensation rate the dealer effectively receives in connection with its warranty transactions and not on whether the franchisor recorded a nominal transaction crediting the dealer at the requisite rate.

Ford also argues that the district court erred in concluding that, "[a]lthough the Act is silent regarding whether and how franchisor-manufacturers may distribute compliance costs, it cannot be the case that the franchisee-dealers--the class of intended beneficiaries--bear the entire burden." Slip op. at 11. According to Ford, the district court erred in reaching this conclusion as to the intended effect of the NJFPA, since regulated entities frequently pass statutory compliance costs along to retailers who do not then "bear the entire burden" of those costs, but rather pass those costs on to consumers. See br. at 18-19; 20-21.

_____

10. Because the reimbursement rate for the labor associated with warranty repairs is not at issue, we assume equal rates for the labor used in warranty and non-warranty repairs.

17

We are unpersuaded by this argument, which ignores the fact that the purported "compliance costs" which Ford shifted to Liberty were not incidental to compliance with an independent regulatory mandate, such as a vehicle safety standard or an environmental regulation, but rather were the very subject of the substantive regulation at issue, which explicitly mandates that "the motor vehicle franchisor shall reimburse" its franchisee at the "prevailing retail price." N.J. Stat. Ann. S 56:10-15(a) (emphasis added).

In contending that it may shift to Liberty the cost of complying with that mandate, Ford essentially insists that it can achieve statutory compliance by requiring Liberty to reimburse itself.[11] This shifting of the retail cost of warranty parts not only violates the clear mandate that Ford as the franchisor pay Liberty the retail price for warranty parts, but also frustrates the purpose behind a statute that was intended to deny the franchisor the "opportunity to isolate himself from the warranty he issues," to protect dealers against "arbitrary actions by manufacturers," and to ensure that warranty repairs are of the same quality as retail repairs. Legis. Statement. Accordingly, we agree with the district court's conclusion that Ford's imposition of the DPS contravened the legislative purpose as well as the clear statutory language of the NJFPA. We, therefore, will affirm the March 13, 1996 order granting Liberty's motion for summary judgment on its NJFPA claim.

B. The September 19, 1996 Order

After the district court entered its March 13, 1996 order holding that the DPS violated the NJFPA, Ford ceased imposing the DPS, but adopted a new policy requiring

_____

11. Since the DPS deprived Liberty of the reimbursement which Ford statutorily was obligated to pay, the issue of whether Liberty, as Ford argues, effectively could recover the losses resulting from this deprivation through other transactions becomes immaterial. See br. at 18-21. We note, however, that in light of the difficulties inherent in redistributing warranty losses through retail transactions, see supra note 6, the district court appears to have been correct in finding that dealers ultimately would bear a significant portion of the costs shifted to them through the DPS. See slip op. at 8.

18

dealers to document claimed retail rates by submitting proof of the prices the dealer charged actual retail customers for the same part during the prior six months. See app. at 513–17. After Ford rejected Liberty's reimbursement claims for failure to comply with this requirement, Liberty objected to the requirement in a Motion to Enforce the district court's March order, which alleged that Ford's new policy imposed insurmountable burdens designed to preclude dealers from receiving retail-rate reimbursements. See id. at 498–500. Ford responded that it adopted its policy in a good faith attempt to comply with the "part-by-part, sale-by-sale" retail rate analysis set forth in Liberty I, 149 F.R.D. at 76, and sought discovery as to how burdensome other dealers found the policy and as to the methods other franchisors used to determine their dealers' retail rates, in order to refute Liberty's allegations that Ford's policies were excessively burdensome. See app. at 729–30.

Although the district court denied Liberty's Motion to Enforce "given the non-specific language of the March 13, 1996 order," slip op. at 1, it entered an order "nunc pro tunc to March 13, 1996" requiring Ford to adhere to the "procedure the parties followed . . . until . . . April 1996, i.e., reimbursement . . . at [Liberty's] retail rate, calculated . . . at 77% over [Liberty's] cost." Id. at 2–3. The court ordered Ford to continue processing Liberty's reimbursement claims based on a 77% markup "unless and until the parties agree that a retail rate, calculated at a later date, is more accurate, another mutually acceptable computation of the retail rate is agreed upon, or, as long as this court retains jurisdiction, on a showing by [Ford] that the procedure should be changed." Id.12

_____

12. The impact of this order is significant. Ford disputed whether Liberty's claimed 77% markup was reasonable, see app. at 321, but had no reason to pursue the issue in light of the DPS, which reduced Liberty's reimbursements to Ford's standard 30–40% markup, rendering the claimed retail rate irrelevant. However, after the court invalidated the DPS the retail rate became determinative of the required reimbursement amount. Yet the court, in its September order, bound Ford to the 77% rate Ford had accepted under protest and precluded Ford from adopting any method for questioning or substantiating that rate.

19

Ford contends that the district court erred in restricting Ford's new reimbursement policy, the legality of which neither was challenged in Liberty's complaint nor was addressed in the district court's prior order, without providing Ford an adequate opportunity to address the factual and legal issues surrounding the policy. We agree, and therefore will reverse the September 19, 1996 order.

The district court did not explain the procedural grounds upon which it proceeded to award relief restricting Ford's policy, after denying the only motion contesting that policy.13 While it is unclear whether the district court intended the order as a sanction for what it perceived as an "end run around the clear intention of" the March order, slip op. at 1-2, or as an entry of judgment on Liberty's allegation that Ford's newly adopted policy violated the NJFPA, we conclude that we cannot sustain the order on either basis.

We cannot sustain the September order as a sanction for noncompliance with the court's March order because the policy which the court restricted in the September order did not violate any clear mandate set forth in the March order. The district court in fact denied Liberty's Motion to Enforce the March order "given the non-specific language" thereof, and thus recognized that the March order, in invalidating the DPS as an offset against a dealer's claimed retail rate, did not preclude Ford from requiring a dealer to substantiate its claimed retail rate. Slip op. at 1. 14 This

_____

13. Liberty's complaint, which challenged the imposition of the DPS to offset its retail rate, is silent as to the proper method for establishing the
retail rate. While the complaint sought an injunction against any "financial imposition . . . as a recoupment . . . for reimbursements paid or to be paid," it did not seek any relief dictating Liberty's retail rate or
the procedure used to establish it. See app. at 19-20. The district court's
March order is equally silent regarding the proper calculation of Liberty's
retail rate.

14. In discussing the scope of its March order, the district court explained,

      the specific declarations as to liability which[Liberty] sought in
      Count One, while implicit in [the March] order granting summary
      judgment as to Count One, were not explicit, presumably the reason
      why the spirit if not the letter of that order -- and certain
specific

court repeatedly has refused to uphold orders entered as sanctions based on conduct that did not violate a clear, specific mandate. See, e.g., Harris v. City of Philadelphia, 47 F.3d 1342, 1352 (3d Cir. 1995) (reversing imposition of sanctions where decree sought to be enforced lacked"an unambiguous provision" prohibiting the conduct at issue); Louis W. Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 771 (3d Cir. 1994) (holding that "[b]road, non-specific language" in an order does not give a party "fair notice of what conduct will risk contempt" and thus cannot support imposition of sanctions); Eavenson, Auchmuty & Greenwald v. Holtzman, 775 F.2d 535, 544 (3d Cir. 1985) (holding that where party had "reasonable grounds to believe" conduct "was in compliance with the district court's order," "imposition of sanctions was not warranted and constituted an abuse of discretion"); Inmates of Allegheny County Jail v. Wecht, 754 F.2d 120, 129 (3d Cir. 1985) ("Persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct."). Because the March order did not contain a clear, specific mandate precluding Ford from adopting policies for verifying a dealer's retail rate or requiring Ford to apply a particular retail rate, we cannot sustain the September order as a sanction against Ford's purported "end run around the clear intention of" the March order. Slip op. at 2.

Nor can we sustain the September order as an entry of judgment on Liberty's claim, first raised in its Motion to Enforce, that Ford's new policy violated the NJFPA. A court

_____

     language in and the clear thrust of the opinion-- have since been
     ignored or evaded by [Ford].

Slip op. at 1. The district court did not and this court cannot identify any "specific language" in the March opinion that was "ignored or evaded" by Ford's new reimbursement policy. Even if the declarations of liability Liberty sought in Count I had been "explicit" in the March order,
those declarations dealt exclusively with surcharges that offset retail rates and not with procedures for establishing retail rates. See app. at 18-19. Nothing in the March order explicitly or implicitly required Ford to accept Liberty's claimed retail rate of 77% or prohibited Ford from adopting policies for substantiating dealers' retail rates.

21

may enter summary judgment in favor of a party only when the pleadings and the factual record before the court demonstrate that there "is no genuine issue as to any material fact" and the party is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying these standards, the court must construe the facts in the light most favorable to the party against whom judgment is sought. See Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 65 (3d Cir. 1996). Moreover, before entering summary judgment against a party, the court must afford that party "adequate notice and time to present to the district court material relevant to [its] claim in order to demonstrate that there is a genuine issue of material fact that renders summary disposition . . . inappropriate." Hilfirty v. Shipman, 91 F.3d 573, 578 (3d Cir. 1996). The court also must provide an adequate opportunity for discovery of the material facts. See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 183 (3d Cir. 1997).

In this case the district court entered a judgment awarding relief against Ford without granting it an opportunity to obtain discovery or present evidence regarding the material issues as to the nature of the new reimbursement procedure, the burdens associated therewith, and the intent underlying its adoption. While the district court made no explicit factual findings and disavowed any attempt to resolve these factual issues, stating that it "need not . . . and will not address the procedure imposed by Ford . . . following this court's [March] decision," slip op. at 3 n.2, the court, nonetheless, clearly based the September order on implicit factual determinations regarding the newly adopted procedure.

The court described that procedure as "onerous in the extreme and designed to frustrate any attempt to obtain statutory reimbursement." Id. Moreover, the court's final order described the circumstances of the September order as follows:

> Liberty filed a motion to enforce the March[order] arguing that [Ford's] new procedure acted as an unlawful barrier to Ford's statutory compliance . . . [through] an impracticable or impossible procedure

22

> that violates the NJFPA and this court's previous
> Opinion and Order.
>
> This court agreed. The new procedure . . . imposed a
> literally impossible burden . . . .

February 26, 1997 slip op. at 4. The court's final order thus confirms that the September order rested on implicit findings that Ford's new policy imposed "impossible" and unlawful burdens, id. at 4, that were intended "as nothing more and nothing less than an end-run around" the March order. Id. at 12. Because the court made these findings regarding Ford's newly adopted policy and awarded Liberty relief based upon those findings without allowing Ford to obtain discovery or demonstrate the existence of genuine issues of material fact as to the lawfulness of the policy, we must vacate the September order. See Kachmar, 109 F.3d at 183; Hilfirty, 91 F.3d at 578.15

The September 19 order awarded only declaratory and injunctive relief. Accordingly, as Ford concedes, see br. at 34, our reversing that order has no effect on the award of damages in the district court's final order. It, however, may affect the district court's assessment of the "result

_____

15. While our holding rests on the grounds discussed above, we also note that Liberty was awarded judgment on a claim not raised in the complaint. See Morris v. Philadelphia Hous. Auth., 1996 WL 167615 at * 4 (E.D. Pa.) ("plaintiff may not move for summary judgment on claims not raised in the complaint"), aff'd, 106 F.3d 386 (3d Cir. 1996) (table); Landano v. United States Dep't of Justice, 873 F. Supp. 884, 891 (D.N.J. 1994) ("Plaintiff did not allege [the] claim in its complaint and cannot raise [it] on a . . . motion for summary judgment."). The September order awarded declaratory and injunctive relief other than that discussed above. However, absent a properly supported determination that Ford had violated the NJFPA or an order of the court since the entry of the March order, we cannot sustain any of the relief awarded in the September order.

In reversing the September order on procedural grounds, we express no opinion on the merits of the issues implicitly resolved therein. We note only that the existence of colorable authority for requiring dealers to establish retail rates on a part-by-part basis, see Acadia, 44 F.3d at 1052; Liberty I, 149 F.R.D. at 76, further accentuates the need to assess the lawfulness of Ford's documentation policy based on a properly developed record.

23

obtained" by Liberty in this litigation, which the court considered in calculating the award of attorneys' fees in its final order. See February 26, 1997 slip op. at 10. Accordingly, we will vacate the fee award and will remand that portion of the district court's February 26, 1997 final order for consideration of the effect, if any, of this opinion on the amount of fees Liberty is entitled to recover.

C. Robinson-Patman Act

The Robinson-Patman Act, a 1936 amendment to the Clayton Act, provides in relevant part that:

> [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly . . . or to injure, destroy, or prevent competition . . . .

15 U.S.C. S 13(a).16 To state a claim under the Robinson-Patman Act, a plaintiff must allege facts demonstrating the existence of price discrimination, which the Supreme Court has defined as "merely a price difference." Texaco Inc. v. Hasbrouck, 496 U.S. 543, 558, 110 S.Ct. 2535, 2544 (1990); Federal Trade Comm'n v. Anheuser-Busch, Inc., 363 U.S. 536, 549, 80 S.Ct. 1267, 1274 (1960).17

_____

16. The Act contains a proviso exempting "price differentials which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are . . . sold or delivered." 15 U.S.C. S 13(a). Because we conclude that Ford did not engage in price discrimination or inflict competitive injury within the meaning of the Act, we need not consider the applicability of the proviso.

17. Anheuser-Busch was a primary line injury case addressing injury to the discriminating seller's competitors, in contrast to this secondary line injury case, which alleges injury in competition among the discriminating seller's customers. See Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 106 n.16 (3d Cir. 1992) (discussing distinction between primary and secondary line injury cases). While Anheuser-Busch's broad definition of price discrimination generally is applicable in secondary line

24

The district court dismissed Liberty's claim on the grounds that its allegations challenging the DPS as a form of unlawful price discrimination "fail[ ] to demonstrate the existence of a price difference." Slip op. at 12. The court explained that:

> while it is true that no other . . . dealer was or is subject to a surcharge, this is because no other dealer attempted to enforce the NJFPA. [Liberty] is being reimbursed for warranty parts at seventy-seven percent above cost at the same time that [its] competitors are being reimbursed the standard thirty to forty percent above cost. The surcharge was merely a device to recoup the extra costs [Ford] incurred by reimbursing [Liberty] at the retail rate.
>
> Thus, the surcharge eliminated any price difference that existed by virtue of [Liberty's] enforcement of the NJFPA . . . . [Liberty] was placed in the same position as its competitors: all dealers were effectively reimbursed at the standard rate, albeit in violation of the NJFPA. Thus, there was no price difference.

Id. at 12-13. Exercising plenary review over the district court's dismissal for failure to state a claim and accepting Liberty's factual allegations as true, see Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1997), we agree with the district court's conclusion that Liberty's complaint fails to allege actionable price discrimination.18

_____

injury cases, see Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1271 (3d Cir. 1995), cert. denied, 116 S.Ct. 1264 (1996), this court has warned "against elevating this isolated passage to an all-inclusive definition" particularly in secondary line injury cases. Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 120 (3d Cir. 1980).

18. Because the district court disposed of Liberty's Robinson-Patman Act claim on Ford's motion to dismiss, we confine our analysis to Liberty's allegations and do not consider matters outside the pleadings. We note, however, that the evidentiary record regarding the operation of the DPS, as discussed above in our analysis of the NJFPA issues resolved on a motion for summary judgment, lends further support to our conclusion that the DPS did not result in actionable price discrimination.

According to Liberty's own factual allegations,

> Ford would . . . recoup the increase in reimbursement
> [beyond Ford's standard rate] by assessing against
> Liberty . . . a `dealer parity' . . . surcharge to the
> wholesale price of each vehicle . . . equal to the
> incremental credit for parts; that is, Ford would
> effectively cancel out the additional reimbursement . . . .
> [and] effectually continues to underreimburse Liberty
> . . . for warranty work . . . .

App. at 17-18 (emphasis added). Thus, the facts alleged in the complaint demonstrate that Ford used wholesale vehicle prices as a method for implementing the DPS policy, the intent and effect of which was to reduce Liberty's reimbursements, not to alter vehicle prices.[19] Because the complaint fails to allege any facts demonstrating an actual increase in vehicle prices, we agree with the district court's conclusion that, "[a]lthough these actions violate the NJFPA, they do not create a price difference among[Liberty] and its competitors which violates . . . the Robinson-Patman Act." Id. at 13. We therefore will affirm the dismissal of Liberty's claim for failure to allege facts demonstrating that Ford engaged in price discrimination.[20]

_____

19. Similarly, Liberty states in its brief to this court, "Ford applied the surcharge to the wholesale price of each vehicle [and] thus canceled out the incremental reimbursement. . . . Once this shell-game maneuver was complete, Liberty did not receive retail reimbursement . . . ." Br. at 15-16; see also id. at 23 ("the `parity surcharge' meant no [warranty parts] payment at retail"); id. at 38 ("[t]he price differential . . . is expressly a recoupment of the incremental warranty reimbursement").

20. Assuming arguendo that the surcharge could be viewed as a term affecting vehicle costs rather than reimbursement rates, a "uniform pricing formula applicable to all customers is not a price discrimination under the [Robinson-Patman] act." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 120 (3d Cir. 1980); accord, FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1026 (2d Cir. 1976) (finding "no violation . . . in pricing plans which, though varying prices according to different terms of sale, were administered equally to all purchasers"). Ford's policy was to recoup through the DPS any reimbursement exceeding Ford's standard rate. The fact that Liberty, as the only dealer to claim incremental reimbursements, was the only dealer to incur charges under this uniform policy does not give rise to a price discrimination claim.

26

Even if the DPS resulted in a vehicle price difference, we would be compelled to affirm the dismissal on the grounds that Liberty's allegations do not demonstrate the existence of the competitive injury required to sustain a Robinson–Patman Act claim. As this court has explained, "price discriminations are not illegal per se. . . . [I]n order for a price difference to be illegal . . . [it] must have the proscribed anti-competitive effect." J.F. Feeser, Inc. v. Serv-a-Portion, Inc., 909 F.2d 1524, 1532 (3d Cir. 1990) (citing Anheuser-Busch, 363 U.S. at 533, 80 S.Ct. at 1276). Liberty's complaint did not allege competitive injury resulting from the imposition of the DPS. See app. at 24. While Liberty alleged "economic loss . . . as a consequence of . . . underreimbursement," it did not allege that this loss placed it at a disadvantage relative to its competitors who were subjected to the same underreimbursement. Id. at 18. In arguing to this court that the DPS inflicted competitive injury because it was "exacted from Liberty and none of its competitors," br. at 38, Liberty ignores the fact that, according to its complaint, the DPS was calibrated to "equal . . . the incremental credit" that Liberty received while its competitors did not. App. at 18.21 Because any disadvantage arising from the DPS merely offset an advantage conferred uniquely on Liberty, the DPS did not have the anticompetitive effect required to state a claim under the Robinson–Patman Act. See J.F. Feeser, 909 F.2d at 1532.

_____

21. Liberty suggests, in passing, that the surcharge "could exceed the warranty parts reimbursement at any given time." Reply br. at 6. The district court properly rejected any attempt to base a price discrimination claim on discrepancies between the amount of the incremental reimbursement and the amount of the surcharge, as these discrepancies related only "to particular surcharges" and not to "the structure of the surcharge system," slip op. at 13 n.2, which by Liberty's own admission assessed charges that equaled the total incremental reimbursements. See app. at 18. Thus any difference in Liberty's economic position relative to its competitors was temporary and incidental and therefore not actionable under the Robinson–Patman Act. See Craig v. Sun Oil Co., 515 F.2d 221, 224 (10th Cir. 1975) (rejecting price discrimination claim "based upon . . . billing errors . . . which were corrected").

27

D. Parts Installed Before December 1991

In its motion for summary judgment on the issue of 704<!>damages, Liberty sought to recover not only the

incremental reimbursements it was denied as a result of the surcharge, but also additional reimbursements for warranty parts installed before December 12, 1991, the effective date of Ford's agreement to credit Liberty at retail rates subject to the surcharge. Citing Ford's warranty manual, which permits dealers to submit reimbursement claims for up to one year after a warranty part is installed, Liberty argued that because it demanded retail-rate reimbursements on December 12, 1991, it was entitled to additional reimbursements to supplement the standard reimbursements it had received for parts installed during the year preceding December 12, 1991. See February 26, 1997 slip op. at 6.

The district court held that, "[t]his legal issue was never addressed during the liability phase of this case because Liberty explicitly waived all claims other than its claim for illegal surcharge since December 12, 1991." Id. at 7. The district court cited Liberty's brief regarding liability, in which Liberty expressly stated that it "claim[ed] liability only on the reimbursement amounts recovered by Ford by illegal surcharge since December 1991." Thus, the court concluded, "[b]ecause the court did not grant summary judgment as to liability on this issue, it cannot now award damages." Id.

Liberty's briefs to this court do not challenge the waiver determination that the district court found dispositive, but rather address only the merits of Liberty's entitlement to additional reimbursements for parts installed before December 12, 1991.22 The district court's order entering
_____

22. Liberty addresses the waiver issue only by stating that "Ford's liability for retail payment on claims submitted since December 12, 1991 was never waived. It is recognized in the Court's Orders and decisions, with the exception of the final ruling on . . . damages." Reply br. at 12 (emphasis added). The district court's orders did not "recognize" any liability as to warranty parts installed before December 12, 1991. In the portion of Liberty's brief asserting that it preserved the issue in the district court, Liberty states only that it raised the issue "as to damages"
and does not cite any part of the record where it sought to establish Ford's liability for the reimbursements at issue. See br. at xiv.

28

judgment as to Ford's liability under the NJFPA explicitly stated, "[f]or the reasons stated herein, the court grants [Liberty's] motion for summary judgment as to liability, since December, 1991 only." Slip op. at 14. We therefore conclude that the district court properly refused to award damages on this claim which Liberty failed to raise at the liability stage of the proceedings.

Even if Liberty had not waived the issue, undisputed evidence demonstrates that Ford is not liable for any additional reimbursements for parts installed before December 1991. Liberty claims that it is entitled to additional reimbursements for parts installed between December 12, 1990, and December 12, 1991, because the relevant warranty agreement permitted dealers to submit reimbursement claims within one year from the date of repair. See app. at 139 ("After 1 year from date of repair . . . [w]arranty . . . claims will not be accepted."). Liberty contends that, because Ford first agreed to reimburse Liberty at retail as of December 12, 1991, Ford is obligated to pay Liberty the incremental reimbursement for all warranty parts Liberty installed after December 12, 1990, to supplement the below-retail reimbursements Liberty received for installing those parts. Br. at 40-41.

However, contrary to Liberty's assertion that it "submitted incremental reimbursement claims" on December 12, 1991, id., the letter of that date merely requested an increase in Liberty's reimbursement rate and did not submit any specific reimbursement claims or make reference to any parts already installed and reimbursed at a lower rate. See app. at 286 ("I hereby apply for an increase in warranty parts markup . . . to my retail markup."). Liberty first made specific retail-rate reimbursement claims "for the period of December 12, 1991 to June 30, 1992," in a letter dated September 23, 1992, again making no reference to parts installed before December 12, 1991. App. at 316-17. It was not until December 21, 1992, that Liberty first submitted a request for retail-rate reimbursement for parts installed before December 12, 1991. This request included parts installed during "the years 1986 through 1991 inclusive." App. at 326.

29

Thus, Liberty did not seek the additional reimbursements at issue until December 21, 1992. As Ford accurately contends, pursuant to the warranty manual Liberty's claims "were time-barred on the date they were made" as they pertained to repairs performed before December 21, 1991. Reply br. at 30.23 Because Liberty failed to seek the reimbursements at issue within one year of the repair date, it is immaterial that Liberty sought a higher reimbursement rate on December 12, 1991, in a request that did not present any specific reimbursement claims.24 Similarly, it is immaterial that "[a]s of December 12, 1991, all of Liberty's claims back one year from [the] date of repair were eligible for the incremental warranty payment," reply br. at 13, since Liberty failed to submit those claims before that eligibility expired on December 12, 1992. Accordingly, even if Liberty had not waived its claim to recover additional reimbursements for parts installed before December 12, 1991, we would affirm the district court's rejection of that claim.

E. Prejudgment Interest Rate

In its February 26, 1997 final order the district court, applying the principles of state law that govern awards of prejudgment interest in federal diversity actions, see Zippertubing Co. v. Teleflex, Inc., 757 F.2d 1401, 1414 (3d Cir. 1985); W.A. Wright, Inc. v. KDI Sylvan Pools, Inc., 746 F.2d 215, 219 (3d Cir. 1984), awarded Liberty prejudgment interest on its NJFPA damages at the rates set forth in New Jersey Court Rule 4:42-11. Slip op. at 8-9. Under New Jersey law, a court may award prejudgment interest in its discretion in accordance with equitable principles, and the court's exercise of its discretion should not be disturbed on

---

23. Liberty did not distinguish the 1991 claims from the even more untimely claims dating back to 1986.

24. While Liberty argues that "for the most part" the claims at issue were "already submitted and approved" at Ford's standard rate, reply br. at 13, Liberty makes no argument to support its apparent suggestion that claims for additional reimbursements are exempt from the one-year limitation period that on its face applies to all warranty reimbursement claims. See app. at 139.

30

appeal unless it represents "a manifest denial of justice." In re Petition of County of Essex, 691 A.2d 846, 858 (N.J. Super. Ct. App. Div.), certif. denied, 700 A.2d 876 (N.J. 1997); accord Coastal Group, Inc. v. Dryvit Sys., Inc., 643 A.2d 649, 654 (N.J. Super. Ct. App. Div. 1994).

The district court found that, "because Ford has had the use, and Liberty has not, of the funds retained by Ford by way of illegal surcharges," Liberty was entitled to interest on the surcharges from December 1991 through March 1996. The court concluded that New Jersey Court Rule 4:42-11, which sets forth postjudgment interest rates and prejudgment interest rates in tort suits, "reflect[ed] an equitable rate of return" under the circumstances of the case. See slip op. at 8-9 (citing Zippertubing Co., 757 F.2d at 1414; W.A. Wright, Inc., 746 F.2d at 219). Liberty contends that the district court abused its discretion in applying the New Jersey Court Rules instead of adopting the involuntary loan theory recognized in A-S Dev., Inc. v. W.R. Grace Land Corp., 537 F. Supp. 549 (D.N.J. 1982), aff'd, 707 F.2d 1388 (3d Cir. 1983) (table). Liberty argues that under this theory, the district court should have applied the interest rate Ford would have charged Liberty for late payments or loans during the same period. See br. at 41.

In arguing that the involuntary loan theory is "particularly appropriate" since Liberty "partially underwrote Ford's coverage of its manufacturing defects," id. at 41, 43, Liberty ignores the fact that A-S Development applied the involuntary loan theory as an element of damages and not as a measure of prejudgment interest. See A-S Dev., 537 F. Supp. at 559 (holding that"plaintiff is entitled to damages in an amount to be calculated on the involuntary loan theory"). Liberty points to nothing requiring the district court, in its discretionary weighing of equitable considerations, to adopt this theory and nothing indicating that the interest rates set forth in the New Jersey Court Rules were inequitable under the circumstances of the case.25

_____

25. Liberty emphasizes that the award of prejudgment interest must be determined by "equitable principles," reply br. at 14-15, but raises no arguments and cites no authority indicating that the district court misapplied these principles.

31

Liberty also challenges the district court's conclusion that "[b]ecause Liberty has asserted its claim under N.J.S.A. 56:10-10 and 56:10-15, it is not entitled to prejudgment interest at 12% under N.J.S.A. 56:10-13.5, which applies only to claims under that section." Slip op. at 9 n.3. Liberty argues that "this Court could properly apply" N.J. Stat. Ann. S 56:10-13.5, br. at 42, which provides that,

> [i]f a motor vehicle franchisor fails to make any payment required by this 1991 amendatory and supplementary act within the time specified for payment, interest shall be added to that payment at the rate of 12% per annum from the date payment was due.

This provision, by its terms, applies only to payments required by the 1991 amendatory and supplementary act. It does not apply to Liberty's claim to recover a payment required by N.J. Stat. Ann. S 56:10-15(a), which was codified in 1977 and is not part of the 1991 amendatory and supplementary act. Although section 56:10-15 was amended by the 1991 act, payments required by that section are not payments required by the 1991 act, but are payments required by the 1977 act.26 Liberty has not identified, and this court cannot discern, any abuse of discretion in the district court's determination that the interest rates provided for in New Jersey Court Rule 4:42-11 were equitable under the circumstances of this case. Accordingly, we will affirm the district court's award of prejudgment interest.

_____

26. Liberty argues that the N.J. Stat. Ann. S 56:10-13.5 interest provision
was "enacted at the same time the Legislature amended the warranty reimbursement provision" and is found in the"same statute which amended the NJFPA Warranty Reimbursement Act." Br. at 42; reply br. at 16. However, the 1991 amendments to N.J. Stat. Ann. S 56:10-15 did not affect section 56:10-15(a) but simply added section 56:10-15(c) which is not implicated in this case. Liberty's arguments do not alter the fact that Liberty sought payments required by a preexisting provision, N.J. Stat. Ann. S 56:10-15(a), and not by the 1991 amendatory and supplementary act.

32

F. Costs Associated With The Retail Rate Analysis

The district court awarded Liberty counsel fees and costs associated with this litigation, but rejected Liberty's claim for fees and costs associated with Liberty I because Liberty was not a prevailing party in that case, which culminated in a denial of class certification and a stipulation of dismissal. See slip op. at 10-11. Liberty contends that the district court erroneously excluded, as a cost associated with Liberty I, the $26,185.15 in fees Liberty incurred in compiling a part-by-part analysis of its retail rate over six years. Liberty contends that, because it compiled the analysis after the dismissal in Liberty I, "in contemplation of and in preparation for" the instant case, and because its counsel "reviewed the analysis as part of its litigation strategy" and "briefed and argued" the results thereof in this litigation, the district court should have included the fees associated with the analysis in its fee award instead of excluding them along with the fees arising from Liberty I. Reply br. at 17-18; br. at 44.

While the district court did not articulate a separate rationale for excluding the disputed fees along with the Liberty I fees, it is readily apparent that the fees at issue are not recoverable in this litigation. Liberty prevailed in this litigation on the issue of whether Ford could assess the dealer-parity surcharge to offset a retail-rate reimbursement, an issue that did not require any verification of Liberty's claimed retail rate. 27 Therefore the fees incurred in compiling the retail rate analysis were not "reasonably expended" in pursuit of the "result obtained" in this litigation, and thus properly were excluded from the fee award even if they were not incurred in connection with Liberty I. Slip op. at 10-11 (citing Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939 (1983)). We,

_____

27. Liberty arguably raised the issue of its retail rate in its Motion to Enforce the district court's March order. In that motion, however, Liberty contended that Ford was not entitled to demand documentation of Liberty's part-by-part retail rates over the past six months. Thus Liberty's
motion in no way required a detailed analysis documenting those rates over the past six years. In any event, because Liberty was not entitled to the relief awarded in the September 19, 1996 order, Liberty has obtained no relief on any claim implicating the validity of its retail rates.

33

accordingly, will affirm the district court's exclusion of fees associated with Liberty's retail rate analysis from its fee award.

IV. CONCLUSION

For the foregoing reasons, we will reverse the district court's September 19, 1996 order and will vacate and remand for reconsideration in light of this opinion the award of attorneys' fees in the district court's February 26, 1997 final order. We, however, will affirm in all other respects. The parties will bear their own costs on this appeal.

A True Copy:
Teste:

> Clerk of the United States Court of Appeals
> for the Third Circuit

34